[No. D021800. Fourth Dist., Div. One. Aug. 7, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
JEMAL M. KASIM, Defendant and Appellant.

[No. D023866. Fourth Dist., Div. One. Aug. 7, 1997.]

In re JEMAL M. KASIM on Habeas Corpus.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.

COUNSEL

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley, Jeffrey J. Koch and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HALLER, J.—A jury convicted Jemal M. Kasim of one count of conspiracy to commit aggravated mayhem (Pen. Code,[2] §§ 182, subd. (1), 205) and one count of aggravated mayhem (§ 205). The trial court sentenced Kasim to life in prison with the possibility of parole.

In this consolidated appeal and petition for writ of habeas corpus proceeding, Kasim seeks to overturn his convictions principally on the ground of prosecutorial misconduct, to wit, withholding of critical discoverable evidence that would have impugned the credibility of the prosecution's two main witnesses, who also were accomplices; presenting knowingly false testimony; and making misrepresentations in closing argument. We issued an order to show cause, appointed a referee and directed the referee to take evidence and make findings of fact concerning 22 areas of inquiry.

After an evidentiary hearing, the referee found the trial prosecutor did not disclose during discovery information, which the prosecutor either knew or

---

[2]All statutory references are to the Penal Code unless otherwise specified.

should have known, about benefits received by the accomplice-witnesses.[3] Also, the referee found that in light of the prosecutor's unusual efforts to assist one of the witnesses in avoiding deportation, the prosecutor was not justified in eliciting trial testimony from the accomplice-witnesses that they (i) had not received any promises for their testimony in the case and (ii) believed the San Diego County District Attorney's Office intended to prosecute them for their involvement in the case. Further, the referee found that the prosecutor misrepresented his intentions when he told the jury in closing argument that the accomplice-witnesses would be prosecuted. The referee also found that a police detective did not comply with the trial court's directive to disclose his past dealings with the accomplice-witnesses by failing to reveal, among other things, that he had attended a felony sentencing for one of the witnesses and had written a letter of recommendation on behalf of this witness.

After summarizing the facts underlying Kasim's conviction, we set forth the referee's pertinent findings with respect to the allegations of prosecutorial misconduct during discovery and trial. As explained below, because we find there was prejudicial prosecutorial misconduct, we grant the petition for writ of habeas corpus and reverse the judgment for a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

*The Criminal Offense, Investigation and Evidence at Trial*

Kasim, who came to the United States in 1976 from his native Kurdistan, was active in local Kurdish politics and became the leader of the Kurdish Democratic Party in California. Abdul Mustafa, who also immigrated to the United States from Kurdistan in 1976 and was active in local Kurdish politics, knew Kasim. Mustafa decreased his involvement in the local community activities but continued to provide information to the Federal Bureau of Investigation about Kurdish and Middle Eastern affairs. Kasim and Mustafa had a falling-out in 1989.

Kasim owned a small produce store in National City and became friendly with the Gonzalez family, who lived nearby. Enrique Gonzalez was a member of the "Southside Mob" gang in National City; his younger brother Arturo also was a member of the gang. Kasim recruited Enrique Gonzalez to assault and injure Mustafa. In the fall of 1989, Kasim drove the Gonzalez

---

[3]The referee also found the prosecutor never told defense counsel that information the prosecutor deemed privileged existed, notwithstanding the prosecutor's testimony to the contrary during the evidentiary hearing.

brothers to Mustafa's produce store in La Mesa; when they arrived, Kasim told Arturo Gonzalez to go into the store and buy candy from "an Arabian guy." Arturo did as he was instructed and when he returned to the car, Kasim told him to describe the "Arabian guy" to his brother.

After some failed attempts, Enrique Gonzalez reported back to Kasim that he was unable to get close enough to Mustafa to assault him. Gonzalez suggested Mustafa could be shot in the legs from a distance. Kasim agreed. Gonzalez recruited two other "Southside Mob" gang members—Simon Jara and Matthew Miner—as well as Elliot Limbrick to carry out the attack on Mustafa. Miner agreed to do the actual shooting.

On October 26, 1989, Miner and Gonzalez approached Mustafa's store while Jara and Limbrick waited in Miner's car. Miner, armed with a shotgun, walked up to Mustafa, who was standing on the steps outside his store, and shot him in the right leg from close range. Mustafa tumbled down the steps. Miner fired a second shot into Mustafa's left hip and stomach. Mustafa lost his right leg as a result of the shooting and was hospitalized for two months. At the time of the shooting, Mustafa had "a lot of cash in [his] pocket" and there was money in the cash register, but there was no attempt to rob him.

The following morning Kasim went to the Gonzalez residence, told Enrique he had done a " 'good job' " and gave him six $100 bills. Gonzalez gave $100 to Limbrick and $200 to Jara—$100 for Jara himself and $100 for Miner.

During the fall or winter of 1989, Gonzalez confided to National City Police Detective Mark Musgrove that he had been hired by an "Arab guy to go beat up another Arab guy." Musgrove, who believed that the assault had not yet occurred, advised Gonzalez not to become involved. During this time frame, Musgrove saw Gonzalez with a "wad" of money.

Meanwhile, investigators had been largely stymied in their attempts to solve the crime. However, they were able to trace the getaway car to Miner because a woman had written down the license plate number. When investigators contacted Musgrove in April 1990 to obtain photographs of Miner and other "Southside Mob" gang members, Musgrove remembered Gonzalez's comment about being hired to beat up an Arab. Musgrove contacted Gonzalez, who admitted his involvement in the attack on Mustafa, named his

accomplices and agreed to cooperate and testify against the others. Musgrove did not arrest Gonzalez at that time.[4]

In late 1993, Kasim, who had spent more than one year in the Middle East, returned to the United States. On November 12, 1993, Kasim was arrested after investigators learned he was about to leave the country again. On November 14, 1993, Jara was arrested; after he admitted his involvement and agreed to cooperate, Jara was released. On November 22, 1993, Miner was arrested.[5]

The trial of Kasim and Miner began in June 1994; Gonzalez and Jara were key prosecution witnesses. They admitted their respective roles in the incident and detailed Miner's conduct. Gonzalez also specified Kasim's role. Both Gonzalez and Jara testified that no deals had been made for their testimony other than that they would be charged and the district attorney's office would be fair.

Kasim, who testified in his own defense, was convicted of conspiracy to commit aggravated mayhem and aggravated mayhem; he was acquitted of attempted murder. During direct examination, Kasim denied plotting with Gonzalez to assault Mustafa and testified he never trusted Gonzalez. During cross-examination, the prosecutor impeached Kasim with a check made out by Kasim to a bail bondsman on behalf of Gonzalez. Outside the presence of the jury, Kasim's counsel moved for a mistrial, complaining that the prosecutor had not turned over the check and a bail receipt as part of discovery and had used the evidence to "sandbag" Kasim on cross-examination. The trial court found there was no discovery violation and denied the motion for a mistrial.

Miner, who did not testify, was acquitted on all charges.

Gonzalez and Jara were not charged in connection with the attack on Mustafa until July 1996, after this court ordered an evidentiary hearing on the allegations of prosecutorial misconduct.

*Prosecutorial Actions Before and During Trial*

1. *Discovery Issues*

On March 7, 1994, John Cotsirilos, Kasim's trial counsel, made an informal discovery request, seeking among other things, all information

---

[4]Over the next three years, law enforcement had numerous contacts with Gonzalez and Jara that became relevant in later discovery motions, which served as the bases of the charges of prosecutorial misconduct.

[5]Limbrick never has been arrested or charged in connection with the attack on Mustafa.

regarding promises, inducements and threats regarding Gonzalez in his role as a confidential police informant. On March 21, 1994, Deputy District Attorney James Fitzpatrick responded by stating in pertinent part: "[A]ll of the information which I have concerning this case is included in the discovery. I do not believe at this time that additional discoverable material exists in this case."

On April 11, 1994, Cotsirilos filed a discovery motion, again requesting information on benefits received or promised to Gonzalez.

On June 13, 1994, before the presentation of evidence, Cotsirilos told the trial court that he did not believe the defense had been provided complete discovery regarding Gonzalez and Jara. Fitzpatrick responded by stating Gonzalez and Jara were not police informants and they had not received any promises or benefits in exchange for their testimony. Fitzpatrick said: "[T]here's been no underhanded agreements, no winks, no nods, no handshakes, and no agreements with their counsel."

Also, on June 13, 1994, the trial court conducted an in camera hearing on the discovery issues, which was attended by Fitzpatrick, district attorney investigator Vincent Krolikowski and Detective Musgrove. Fitzpatrick told the court Gonzalez's contacts with Musgrove over the years were informal— "nothing that ever amounted to an informant status." Fitzpatrick also told the court Jara had worked as a confidential informant for a special police unit in 1992. Musgrove testified he had arrested Gonzalez for attempted murder for a different incident in 1992. (See fn. 6, *post.*) Musgrove denied ever giving Gonzalez and Jara any monetary compensation other than buying them a hamburger or burrito. Except for the following comment, Musgrove testified he had not given any benefits to Gonzalez: "The only thing I told Enrique in that particular case [the 1992 attempted murder case] was that—I tried to get word to him through his family that he needed to turn himself in and that he should do it to me, because he knew that although he had to go to jail, he wouldn't be roughed up."[6] The trial court ruled this information should be provided to the defense and Musgrove was directed to write a supplemental report for the defense.

On June 22, 1994, Cotsirilos again expressed concern about inadequate discovery. Cotsirilos said he was "seeking knowledge as to whether [Gonzalez] is actively working or has been working during the relevant time periods

---

[6]It appears Musgrove did not correctly remember the date of that incident. That case involved an incident that occurred in late 1991. In that case, Gonzalez pled guilty to the lesser charge of assault with a deadly weapon in January 1992. (See pp. 1369, 1374-1375 & fn. 11, *post.*)

on other cases as a confidential informant, and specifically whether he already has received benefits or promises of leniency in relationship to that status or expects to." Fitzpatrick responded by arguing that any such information was privileged or irrelevant.

Later that day, at Cotsirilos's request, the trial court held another in camera hearing on discovery issues; present were Cotsirilos and Kay Sunday, Miner's counsel. Cotsirilos, who on his own had researched Gonzalez's criminal history, informed the trial court that in 1992 Musgrove attended Gonzalez's assault with a deadly weapon sentencing hearing and because of Musgrove's support, Gonzalez received probation and local time rather than a presumptive prison sentence. Cotsirilos also told the trial court that when Gonzalez was on probation for a 1990 petty theft and violated probation by not performing public work service and attending a Shoplifting Anonymous course, he was not sent to jail on the probation revocation; instead, the terms of Gonzalez's probation were modified so that Gonzalez could complete the volunteer work with the National City Police Department.[7]

After these in camera hearings (see fn. 7, *ante*), the trial court ordered the prosecution to turn over all information relating to Gonzalez's *and Jara's* status as informants for any law enforcement agency, including all benefits received by Gonzalez *and Jara* as a result of their informant status.

The prosecution did not comply.

### 2. *The Trial Testimony of Gonzalez and Jara*

In response to Fitzpatrick's questions at trial, both Gonzalez and Jara testified they believed the district attorney's office was going to prosecute them for their involvement in the attack on Mustafa, and no promises had been made in return for their testimony in this case.

When Cotsirilos cross-examined Gonzalez, Gonzalez initially testified that Musgrove had never done anything for him and he was testifying "out of concern as a citizen" and "because of [his] conscience." However, when Cotsirilos confronted Gonzalez with a transcript of the 1992 sentencing hearing, Gonzalez admitted that Musgrove had helped him avoid a presumptive state prison sentence of up to seven years and this was a benefit. Gonzalez also admitted that in the petty theft case he was allowed to spend 92 hours briefing Musgrove about gang activity in lieu of having his probation revoked.

---

[7] The trial court also conducted an in camera hearing regarding the background of Jara on June 23, 1994. Law enforcement officials informed the court that Jara had acted as an informant in a sensitive operation and was continued on a grant of probation.

In response to Cotsirilos's questions, Jara initially testified he "[felt] bad about what happened" to Mustafa and was testifying as a "good citizen." Jara denied he had been promised leniency or benefits for his testimony. But when pressed, Jara admitted he had served only 180 days instead of a potential 8-year prison term for an assault with a deadly weapon that took place after the attack on Mustafa. Further, Jara admitted he violated his probation in August 1992 by possessing a weapon and associating with gang members, and the probation officer recommended three years in state prison, stating Jara was a "danger to society." Jara conceded the fact that he did not have to spend any more time in jail whatsoever for the probation violation "might have" something to do with his cooperation with the district attorney's office as a confidential informant.

As a sanction for the prosecution's failure to disclose the benefits afforded Gonzalez and Jara, the defense sought the following jury instruction pursuant to *People* v. *Zamora* (1980) 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361]: "Evidence that Enrique Gonzalez received benefits in exchange for his testimony and cooperation in this case and that he provided information in other cases was suppressed by the prosecution. You are to conclusively find that Enrique Gonzalez has received benefits in exchange for his cooperation in this case and for providing information on other cases. You are to weigh this fact in evaluating his credibility and bias."

The trial court declined to give an instruction that indicated the government had intentionally suppressed evidence and Gonzalez had received benefits in conjunction with this case. Instead, the court added the following language to CALJIC No. 2.20: "The existence or nonexistence of any interest or bias or motive on the part of any particular witness. In that regard, you are to find that Enrique Gonzalez, the witness Enrique Gonzalez has received benefits in the past in exchange for his cooperation with law enforcement. And you should weigh that fact in evaluating his credibility, the existence of any bias, interest or motive on his part. Of course those are all judgments of fact for you to make. But you are to find that he has received those benefits. The effect of that fact on your evaluation of his credibility, of course that's for you to decide."

Outside the presence of the jury, the trial court also noted that Musgrove was less than forthcoming.

### 3. *Prosecutor's Arguments*

In his closing arguments, Fitzpatrick said that Gonzalez and Jara would be held accountable for their crimes after Kasim and Miner were convicted.

Among other things, Fitzpatrick told jurors: "There have been no deals made to either [Gonzalez or Jara]. No deals whatsoever. And you know from the evidence that they are going to be charged with the same charges. [¶] But it is all or nothing, ladies and gentlemen . . . . You either hold everyone accountable or no one is held accountable, because they all did it together. . . ." At another point, Fitzpatrick told jurors: "If there were any benefits to [Gonzalez and Jara] in the past that was exactly that, in the past. Don't forget that, this case is entirely different. Everything is on the table and you know that."

### Appeal and Habeas Corpus Proceeding

On August 22, 1994, Kasim filed a notice of appeal. On June 22, 1995, Kasim filed his opening appellate brief, which raised 14 assignments of error, including prosecutorial misconduct, insufficiency of the evidence and unreasonable pretrial delay. Concurrently, Kasim filed a petition for writ of habeas corpus regarding his allegations of prosecutorial misconduct: failing to disclose discoverable evidence; eliciting false testimony from Gonzalez and Jara that they expected to be charged with the same crimes; and misrepresenting to the jury that Gonzalez and Jara would be charged after the trial. The petition included an investigator's declaration that as of May 16, 1995, neither Gonzalez nor Jara had been charged in connection with the attack on Mustafa.

### 1. Appointment of Special Referee

On April 24, 1996, this court designated a superior court judge as a special referee to conduct an evidentiary hearing to determine factual issues in 22 areas of inquiry raised by the petition for writ of habeas corpus and the record on appeal.[8]

Broadly speaking, the major areas of inquiry were:

—Whether Fitzpatrick's written and oral communications with Kasim's trial counsel and with the trial court, including representations made in camera, regarding discovery involving the informant status of Gonzalez and Jara, any benefits conferred on them by law enforcement and any deals or promises made to them in connection with this case were accurate, and, if not, what was the nature of each inaccuracy.

---

[8]In our order, we designated Superior Court Judge David M. Gill, who was the trial court judge, as the special referee. Gill recused himself and Superior Court Judge William D. Mudd replaced Gill as the special referee who conducted the evidentiary hearing and made the factual determinations.

—Whether Detective Musgrove of the National City Police Department and district attorney investigator Krolikowski provided accurate testimony during the June 13, 1994, in camera hearing, and, if not, what was the nature of each inaccuracy.

—Whether, at the time Fitzpatrick asked Gonzalez and Jara on direct examination if they were aware that the district attorney's office intended to prosecute them, the question accurately reflected the intentions of the office.

—Whether, at the time he questioned Gonzalez and Jara on direct examination if any promises had been made in return for their testimony, Fitzpatrick knew in advance that they would say no, and, if he did, was he justified in presenting such testimony to the jury.

—Whether, at the time Fitzpatrick in his closing argument told jurors that Gonzalez and Jara would be prosecuted after Kasim and Miner were convicted, the representation accurately reflected the intentions of the district attorney's office.

—Whether the district attorney's office was going to charge Gonzalez and Jara for their involvement in the attack against Mustafa, who in the office made the decision, when was the decision made and why was it made.

—What benefits had Gonzalez and Jara received in this case or in any other criminal case in exchange for providing information used by the prosecution in this case.

In June 1996, as a result of publicity surrounding the case, David Gappa, an attorney with the Immigration and Naturalization Service (INS), wrote to the referee about Fitzpatrick's intervention in deportation proceedings against Gonzalez in 1994. According to Gappa, Gonzalez had been subject to deportation because of a January 1992 assault with a firearm conviction and that while the deportation proceeding was pending, Fitzpatrick had written two letters to Gonzalez's immigration lawyer concerning Gonzalez.[9] Gappa further reported that on July 13, 1994, the immigration judge ordered Gonzalez deported. Gappa also revealed that on October 11, 1994, Fitzpatrick agreed to let Gonzalez withdraw his plea to the 1992 assault with a

---

[9]Fitzpatrick wrote the first letter to Gonzalez's immigration lawyer on June 23, 1994, during Kasim's trial. The letter explained Gonzalez was a prosecution witness in the Kasim-Miner matter and stated in pertinent part: "I expect that the trial will conclude within two weeks. Following that, the District Attorney will make certain decisions regarding Enrique

firearm conviction and substitute a plea to a lesser included offense and then have the conviction to the lesser offense expunged. Gonzalez's new immigration attorney had argued in the absence of the assault with a firearm conviction, Gonzalez was no longer deportable. Gonzalez has not been deported.

Meanwhile, on July 22, 1996, the district attorney filed a felony complaint against Gonzalez and Jara, charging each with conspiracy to commit aggravated mayhem and aggravated mayhem. Gonzalez and Jara were booked and released on their own recognizance on August 7, 1996.

### 2. *Evidentiary Hearing*

The referee conducted the evidentiary hearing during the week of December 16, 1996, and heard testimony from 16 witnesses, including Fitzpatrick; Musgrove; INS Attorney Gappa; Cotsirilos; former Assistant District Attorney Richard Neely; Assistant District Attorney Gregory Thompson; Gonzalez's counsel, Albert Arena; and Jara's former counsel, Larry Stoerts.

Fitzpatrick, who submitted a 22-page declaration, testified he made no promises to Gonzalez in exchange for his cooperation and testimony, and told Gonzalez he would be charged just as the other individuals and he had to trust the district attorney's office to be fair with him. According to Fitzpatrick, he took this position at the directive of Neely, then the second-in-command of the district attorney's office, with whom he discussed the case frequently. Fitzpatrick maintained that at all times he followed the instructions of his superiors—Neely and Keith Burt, then the head of the gang unit. The decision that Fitzpatrick should assist Gonzalez in having his criminal conviction expunged was made by Neely, who believed permanent deportation was too harsh of a punishment for Gonzalez and inconsistent with the promise Gonzalez would be treated fairly if he testified favorably at the Kasim trial.

Fitzpatrick further testified that although he knew Gonzalez was a member of the "Southside Mob" gang, Musgrove never told him that Gonzalez was a

---

Gonzalez, including decisions which may affect Gonzalez's past criminal convictions, and decisions about future criminal charges. Those decisions will not be made by July 13, 1994."

Fitzpatrick's second letter was dated July 13, 1994, one day after Kasim's trial ended. This letter stated in pertinent part: "The *Kasim/Miner* trial ended yesterday, July 12, 1994. I expect that the District Attorney will now file one or more felony charges against Enrique Gonzalez for his involvement in an incident which occurred on October 26, 1989. Those charges may include Conspiracy to Commit Aggravated Mayhem, Attempted Murder and Aggravated Mayhem. [¶] At this point, it is in our interest to have Enrique Gonzalez remain in the United States so that he may be prosecuted for these offenses."

police informant. Fitzpatrick was aware in November 1991 that Gonzalez was arrested for attempted murder, but at Burt's direction he had no contact with the case or the sentencing. Fitzpatrick first learned of Musgrove's involvement in Gonzalez's prior criminal cases when Cotsirilos produced the court transcripts at trial when cross-examining Gonzalez.

Neely, who had difficulty recalling details of the case, testified he approved the no-deal arrangement with Gonzalez. Neely did not recall Fitzpatrick suggesting deportation was too harsh a disposition for Gonzalez; rather, Neely recalled the reason for the expungement was to ensure Gonzalez's availability to testify in a civil lawsuit brought by Mustafa.

Arena testified that Fitzpatrick communicated that Gonzalez would receive a "deal" in exchange for his testimony in the Kasim case. Arena, however, could not recall the precise nature of the deal, i.e., whether Gonzalez would not be prosecuted or if prosecuted he would not be incarcerated.[10] Arena did recall that as part of the agreement Fitzpatrick had agreed to sanitize Gonzalez's criminal record so he would be able to remain permanently in the United States. Arena did not feel he had an obligation to tell the court that his client, Gonzalez, had lied on the witness stand when he testified there was no deal.

Stoerts testified no promises had been made to Jara in exchange for his testimony in the Kasim case.

Cotsirilos testified that when he confronted Arena, Arena implied he had some assurance Gonzalez would be taken care of.

Musgrove testified that during Kasim's trial he did not recall Gonzalez being assigned to perform 92 hours of public service work for the National City Police Department. Musgrove conceded in retrospect he should have disclosed that benefit and the fact he supported Gonzalez during a sentencing hearing in which Gonzalez was facing a state prison term and instead received probation.[11] Musgrove acknowledged he wrote a letter of recommendation for Gonzalez but testified this was because Gonzalez wanted to get a job, not as a benefit for his cooperation in the Kasim case.

---

[10]In his factual determinations, the referee observed that this testimony was not credible and found, "the proof establishes no such agreement."

[11]This testimony referred to the following two cases: (1) In January 1990, Gonzalez committed petty theft and the following month pled nolo contendre. (No. M592905.) In May 1990, Gonzalez was charged with violating the terms of his probation. On July 3, 1990, probation in the petty theft case was revoked, reinstated and modified to require 92 hours of volunteer work for the National City Police Department. (2) In November 1991, Gonzalez was arrested on attempted murder and related charges. (No. CR127590.) In January 1992,

### 3. *Special Referee's Conclusions*

The referee filed his factual determinations on February 21, 1997. In a preamble to his factual determinations, the referee noted he had to evaluate the credibility of various witnesses to resolve "clear conflicts" in their testimony. The major factual determinations, pertinent to this consolidated appeal and writ proceeding, were:

—Fitzpatrick's correspondence to Cotsirilos regarding discovery was inaccurate and Fitzpatrick either knew or should have known that there was evidence of favorable treatment by law enforcement to Jara and Gonzalez for their past cooperation;

—Detective Musgrove's testimony in the June 13, 1994, in camera hearing was either inaccurate or misleading because Musgrove failed to disclose he had (1) attended Gonzalez's felony sentencing and helped him avoid a prison term, and (2) written a letter recommending Gonzalez be hired for a job;[12]

—The prosecution failed to comply with Judge Gill's June 23, 1994, discovery order;

—Fitzpatrick made inaccurate statements to the trial court on June 24, 1994, when he said Gonzalez had not received any benefits;

—During his direct examination of Gonzalez, Fitzpatrick did not accurately represent (1) his intentions regarding prosecuting Gonzalez and (2) whether promises had been made to Gonzalez in return for his testimony in light of Fitzpatrick's "extreme, and virtually unprecedented," intervention in Gonzalez's deportation proceedings;

—Contrary to Fitzpatrick's statements that Gonzalez and Jara would be prosecuted, by the time he argued this to the jury, Fitzpatrick personally had no intention of filing charges; moreover, because of various personnel changes in the district attorney's office, Fitzpatrick ultimately

---

Gonzalez pled guilty to assault with a deadly weapon (lesser included of attempted murder). On May 18, 1992, Gonzalez was sentenced to one year in jail and placed on three years of probation; Musgrove attended the sentencing hearing.

Gonzalez was also arrested in August 1990 for assault with a deadly weapon; in November 1990, he pled guilty to misdemeanor assault and was sentenced to public service. (No. S51421.) Probation was revoked in November 1991.

[12]The referee's findings did not reference Gonzalez's benefit relating to his probation revocation in 1990 when instead of being sent to jail on the revocation, his probation was modified to require 92 hours of public service work for the National City Police Department. Gonzalez complied by briefing Musgrove on gangs. This information was brought out during the trial when Cotsirilos cross-examined Gonzalez.

was in control of the decisionmaking process for this case and chose not to prosecute the case further;

—The decision to charge Gonzalez and Jara for their involvement in the attack on Mustafa was made on July 2, 1996, by the current district attorney, Paul Pfingst,[13] upon the recommendation of Gregory Thompson, the current assistant district attorney, who concluded it "was the right thing to do since there were no proof problems and the prosecution of these two individuals was always contemplated by the office"; and

—Benefits received by Gonzalez included having his serious criminal record expunged, which allowed him to avoid deportation, remaining free of confinement and not having to answer for his conduct in this case until July 1996. Benefits received by Jara included remaining free of confinement and not having to answer for his conduct in this case until July 1996.

In answering our question regarding Fitzpatrick's closing argument, the referee observed: "[A]ccording to Fitzpatrick . . . [Gonzalez and Jara] were to be prosecuted []regardless of the outcome of the pending trial. The FACT is, however, they never were, and, but for this Panel's request to answer these questions and the attendant publicity generated therefrom, they probably never would have been prosecuted. It is significant to note at this point that the progress notes of DDA Fitzpatrick are missing from the DA file, as well as copies of the correspondence to Gonzalez's immigration attorney . . . . In addition, nowhere are there any notes or memoranda regarding the meetings held between DDA Fitzpatrick and Assistant DA Richard Neely concerning critical decisions being discussed and the dates of those discussions. Further, but for a puzz[]ling memo dated October, 1994, entitled ADDITIONAL PROGRESS REPORT NOTES . . . , there would have been no record of *any* involvement of the DA's Office in Gonzalez's immigration matter, apart from the court files themselves. This court is deeply troubled by the lack of significant documentation to confirm decisions of far reaching consequence, and ones not normally undertaken by the DA's Office. Finally, it is clear there were no impediments to the DA's Office charging Gonzalez and Jara before the term of DA Miller ended. Not only does Mr. Neely have no recollection of telling DDA Fitzpatrick the charging would have to await the new administration, but he was quite specific as to what steps would have been taken if, in fact, the matter was going to be turned over to Mr. Pfingst. DDA Fitzpatrick's explanation that the immigration matter involving Gonzalez needed to be resolved before a decision could be made and that

---

[13]The prosecution of Kasim and Miner took place during the administration of District Attorney Edwin Miller. Pfingst, who had been elected to the position in 1994, took office on January 3, 1995.

*the* District Attorney (Edwin Miller) would have to become personally involved in the matter, is not credible." (Original italics.)

The referee also put the blame for the failure to charge Gonzalez and Jara before 1996 for the Mustafa attack squarely on Fitzpatrick's shoulders: "Since Gonzalez and Jara were not charged until 1996, and since the DA's Office went to unprecedented lengths to keep Gonzalez from being deported (i.e., letting him withdraw his guilty pleas to multiple matters, including a serious/violent felony, then allowing pleas to reduced charges, with expungement), it is apparent that DDA Fitzpatrick did not intend to file the charges. It is equally apparent that Mr. Neely expected the charges to be filed. Given the control DDA Fitzpatrick had over this case, plus the chaos in the office . . . it is apparent the decision was DDA Fitzpatrick's to make. It was not done."

On March 21, 1997, after being informed by the Attorney General that additional relevant materials had been found in the files of the National City Police Department, we directed the referee to conduct an in camera review of the newly discovered materials to determine if the existence of these materials altered his previously submitted factual findings. In his addendum to factual determinations by referee filed on April 29, 1997, the referee stated: "In summary, these documents show extensive dealings between Detective Musgrove . . . of the National City Police Department and Enrique Gonzalez . . . during the period 1990-1992, including the payment of Gonzalez'[s] fines and active involvement in assisting him with his Court cases. All of this information was highly relevant and probative to attorneys in this case on the issue of prior favors and benefits Gonzalez had received while assisting law enforcement. This Court has already found that the statements of Musgrove and Deputy District Attorney Fitzpatrick . . . were misleading and inaccurate as they related to full disclosure of information regarding Gonzalez. This material may simply be added to the reasons given by this Court for finding that the statements and representations were either false, misleading or inaccurate. In addition, it must be stated and observed that Musgrove's testimony under oath at the evidentiary hearing held by this court was grossly inaccurate if not perjurious. . . ."

## DISCUSSION

### I. *Introduction*

Serious charges of prosecutorial misconduct have been leveled in this proceeding. We examine these accusations carefully, aware that if established they undermine the fundamental core of our judicial system—a search

for truth. We rely upon jurors to ascertain the truth and entrust them with the responsibility of determining whether an accused person is or is not guilty. At times, the decisions we ask jurors to make are particularly difficult and carry with them enormous consequences. Such was the nature of the task presented to this jury. If we expect jurors to do their job, they must be presented with the truth—not just part of the truth, but all of the truth. For if they are not, neither the trial participants nor the public will have confidence in the results.

 Prosecutors have a special obligation to promote justice and the ascertainment of truth. As the California Supreme Court said in *In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234]: "The duty of the district attorney is not merely that of an advocate. His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial, and it is the solemn duty of the trial judge to see that the facts material to the charge are fairly presented. [Citations.] In the light of the great resources at the command of the district attorney and our commitment that justice be done to the individual, restraints are placed on him to assure that the power committed to his care is used to further the administration of justice in our courts and not to subvert our procedures in criminal trials designed to ascertain the truth.

"The search for truth is not served but hindered by the concealment of relevant and material evidence. Although our system of administering criminal justice is adversary in nature, a trial is not a game. Its ultimate goal is the ascertainment of truth, and where furtherance of the adversary system comes in conflict with the ultimate goal, the adversary system must give way to reasonable restraints designed to further that goal."

Put another way: "For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that 'justice shall be done.' He is the 'servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.' [Citations.]" *(United States* v. *Agurs* (1976) 427 U.S. 97, 110-111 [96 S.Ct. 2392, 2401, 49 L.Ed.2d 342].)

In applying these principles, we must not lose sight of the nature of the matter before us, namely the appeal of a specific criminal prosecution.[14] The pivotal question, therefore, is: Did Jemal Kasim receive a fair trial? For the reasons that follow, we conclude he did not.

---

[14]We deny Kasim's various requests to take judicial notice of other cases in which Fitzpatrick was the prosecutor.

## II. *Petition for Writ of Habeas Corpus—Prosecutorial Misconduct*

■ "Our standard of review of the referee's report is settled. The referee's conclusions of law are subject to independent review, as is his resolution of mixed questions of law and fact. [Citations.] . . . The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence. The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying. [Citation.]" (*In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435].) Our review of the record established during the evidentiary hearing shows there is substantial evidence to support the referee's factual findings regarding prosecutorial misconduct. We adopt each of the factual findings necessary to resolve the legal issues of this proceeding. (See pts. II.A., II.B. & II.C., *post.*)

### A. *Discovery Violations*

In *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215] (*Brady*), the United States Supreme Court held ". . . the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[15]

■ In *In re Ferguson, supra,* 5 Cal.3d at pages 532-533, the California Supreme Court imposed a stricter duty upon prosecutors by requiring them to disclose substantial material evidence favorable to the defense without request. Subsequent United States Supreme Court cases expanded the federal duty to also disclose favorable material evidence even if the defense failed to request it. (See *United States* v. *Agurs, supra,* 427 U.S. at pp. 110-111 [96 S.Ct. at p. 2401]; *United States* v. *Bagley* (1985) 473 U.S. 667, 682 [105 S.Ct. 3375, 3383-3384, 87 L.Ed.2d 481] (lead opn. of Blackmun, J.).)

Evidence is material in this context "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States* v. *Bagley, supra,* 473 U.S. at p. 682 [105 S.Ct. at p. 3383] (lead opn. of Blackmun, J.).) Favorable evidence in this context is evidence that "either helps the defendant or hurts the prosecution, as by impeaching one of its

---

[15]A prosecutor also has a statutory duty to disclose to the defense any exculpatory evidence. (See § 1054.1, subd. (e).)

witnesses." (*In re Sassounian* (1995) 9 Cal.4th 535, 544 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

The scope of the prosecutorial duty to disclose encompasses not just exculpatory evidence in the prosecutor's possession but such evidence possessed by investigative agencies to which the prosecutor has reasonable access. (*People* v. *Robinson* (1995) 31 Cal.App.4th 494, 499 [37 Cal.Rptr.2d 183].) "As the California Supreme Court recently noted: 'California courts long have interpreted the prosecutorial obligation to disclose relevant materials in the possession of the prosecution to include information "within the possession or control" of the prosecution. [Citation.] In *Pitchess* v. *Superior Court* [(1974)] 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305], we construed the scope of possession and control as encompassing information "reasonably accessible" to the prosecution. In *Engstrom* v. *Superior Court* (1971) 20 Cal.App.3d 240, 243 [97 Cal.Rptr. 484] (disapproved on other grounds in *Hill* v. *Superior Court* [(1974)] 10 Cal.3d [812,] 820 [112 Cal.Rptr. 257, 518 P.2d 1353], the court held that materials discoverable by the defense include information in the possession of all agencies (to which the prosecution has access) that are part of the criminal justice system, and not solely information "in the hands of the prosecutor." (20 Cal.App.3d at p. 244.) In *People* v. *Coyer* (1983) 142 Cal.App.3d 839, 843 [191 Cal.Rptr. 376], the court described information subject to disclosure by the prosecution as that "readily available" to the prosecution and not accessible to the defense.' (*In re Littlefield* (1993) 5 Cal.4th 122, 135 [19 Cal.Rptr.2d 248, 851 P.2d 42].)" (*Ibid.;* see also *Kyles* v. *Whitley* (1995) 514 U.S. 419, 437 [115 S.Ct. 1555, 1567, 131 L.Ed.2d 490] ["[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."].)

A prosecutor's duty to disclose evidence favorable to the accused extends to evidence reflecting on the credibility of a material witness. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341], overruled on another ground in *In re Sassounian, supra,* 9 Cal.4th at pp. 545-546, fn. 7; see also *Giglio* v. *United States* (1972) 405 U.S. 150, 154 [92 S.Ct. 763, 766, 31 L.Ed.2d 104].) This includes "any inducements made to prosecution witnesses for favorable testimony . . . ." (*People* v. *Westmoreland* (1976) 58 Cal.App.3d 32, 43 [129 Cal.Rptr. 554].)

In *People* v. *Ruthford, supra,* 14 Cal.3d 399, the defendant was convicted of armed robbery, based in large part on the testimony of an accomplice. After trial, the accomplice wrote a letter to the defendant stating that he testified against him because the district attorney had offered to procure a lenient sentence for the accomplice's wife. The prosecutor failed to apprise

defense counsel of this circumstance surrounding the accomplice's testimony. The Supreme Court reversed, observing: "It is a common practice for law enforcement officers or prosecutors to offer certain inducements for the testimony of prosecution witnesses since this is often the only means of obtaining crucial evidence. Yet, as we have often stated, the role of the district attorney is more than that of an advocate. "His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial. . . .' [Citations.] The fundamental responsibility to present material evidence to the court includes a duty to disclose to the defense substantial material evidence favorable to the accused in appropriate cases. [Citation.] Unless the prosecutor is required to make such disclosures the adversary system of criminal justice would be reduced to one in which the determination of guilt or innocence may be controlled by the prosecuting attorney's tactical choice to suppress favorable evidence, or his negligent failure to disclose it, rather than by the well-informed decision of the finder of fact. When such conduct hinders the ascertainment of truth, restraints must be imposed to prevent the denial of a fair trial as guaranteed by the due process clause of the Fourteenth Amendment of the Constitution of the United States." (*People* v. *Ruthford, supra*, 14 Cal.3d at p. 405.)

The factual record presented to this court clearly shows that law enforcement agencies (1) possessed significant exculpatory evidence bearing on the credibility of the key prosecution witnesses—for example, evidence that Gonzalez and Jara had received reduced sentences or escaped prosecution in their own criminal cases and had previously acted directly or indirectly as informants—and (2) failed to disclose it to the defense even in the face of repeated requests.

We need not dwell on the good or bad faith of Fitzpatrick and/or Musgrove in failing to disclose this exculpatory evidence for, as *People* v. *Ruthford, supra*, 14 Cal.3d at page 406, teaches, it does not matter whether such "a prosecutorial failure" is "intentional, negligent or inadvertent." (See also *Brady, supra*, 373 U.S. at p. 87 [83 S.Ct. at p. 1197] [due process violation "irrespective of the good faith or bad faith of the prosecution"].) Here, error is amply demonstrated because there is no doubt that favorable evidence, which should have been made available to the defense, was suppressed.

Having made that determination, the only issue for us is materiality: whether there was a reasonable probability of a different result had the evidence been disclosed. Put another way, the question is whether the suppression resulted in a denial of Kasim's right to a fair trial, "understood

as a trial resulting in a verdict worthy of confidence." (*Kyles* v. *Whitley, supra,* 514 U.S. at p. 434 [115 S.Ct. at p. 1566].) "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" (*Ibid.,* quoting *United States* v. *Bagley, supra,* 473 U.S. at p. 678 [105 S.Ct. at p. 3381].)

We conclude the suppressed exculpatory evidence was material; in other words, we determine that had the evidence been properly disclosed to the defense, there is a *reasonable* probability of a different result. Simply put, Gonzalez and Jara were of paramount importance to the prosecution's case; the results of the trial depended to a very large extent on their credibility. As between Gonzalez and Jara, Gonzalez was even more critical. His testimony was essential to Kasim's conviction because he was the only one to have personal knowledge of Kasim's involvement and to have witnessed the shooting.

Moreover, Gonzalez and Jara were admitted accomplices, and the suppressed information related directly to their credibility. The law recognizes accomplice testimony as unreliable and requires it to be corroborated. (§ 1111; see also CALJIC Nos. 3.11 & 3.18.) The concept takes on added importance where, as here, the credibility of these accomplices was crucial to the prosecution's case. Gonzalez and Jara, both of whom had received lenient sentences in the past because of their cooperation with law enforcement and were facing life sentences in this case, had every reason to testify in a manner that would satisfy the prosecution, hoping to once again receive lenient treatment. The jury, which had to decide whether it could trust Gonzalez's and Jara's testimony, was entitled to know about all historical events bearing on these witnesses' propensity to be truthful or untruthful. Because evidence was suppressed, the factual underpinnings upon which the jury relied to make its critical decisions were seriously eroded.

Once it is determined that undisclosed favorable evidence could reasonably have put the case in such a different light as to undermine confidence in the verdict, there is no need for further harmless error analysis. (*Kyles* v. *Whitley, supra,* 514 U.S. at pp. 434-435 [115 S.Ct. at p. 1566].) Accordingly, reversal is warranted and Kasim is entitled to a new trial.[16]

The Attorney General's arguments under a traditional "harmless beyond a reasonable doubt" analysis are unpersuasive. "[W]here a defendant himself

---

[16]Recently, the California Supreme Court commented on how the evolving *Brady* law has blurred the traditional distinctions between error analysis and prejudice analysis in this area. "A showing by the prisoner of the favorableness and materiality of any evidence not disclosed by the prosecution necessarily establishes at one stroke what in other contexts are separately considered under the rubrics of 'error' and 'prejudice.' For, here, there is no 'error' unless there is also 'prejudice.' (See *United States* v. *Bagley, supra,* 473 U.S. at p. 678 [105 S.Ct. at

discovers before the end of his trial favorable information which the prosecution has failed to disclose, it is very difficult for the defendant to show prejudice," writes the Attorney General. As we shall explain, it simply does not matter that Cotsirilos, Kasim's trial counsel—through his own initiative —had uncovered a good deal of the benefits bestowed on Gonzalez.

First, despite Cotsirilos's successful investigative efforts, the prosecution continued to maintain both before the trial court and the jury that Gonzalez and Jara would be prosecuted. (See discussion, pts. II.B. & II.C., *post.*)

Second, as a result of the evidentiary hearing, we know that the extent of benefits conferred on these two accomplice-witnesses was greater than that exposed during trial by Cotsirilos. The benefits not revealed during trial included the highly unusual intervention by the district attorney's office in Gonzalez's deportation proceedings. While there is no evidence that Fitzpatrick knew about the deportation proceedings before Gonzalez's immigration attorney contacted him in the middle of the trial, the prosecutor wrote a letter to the immigration attorney on June 23, 1994, one day before Gonzalez's testimony. (See fn. 9, *ante.*) Thus, during the trial, Fitzpatrick, at the very least, made a decision to intervene in his witness's immigration proceeding—a clear benefit—and this should have been disclosed to the defense.

■ The duty to provide discovery is not limited to the time before trial; discovery is an ongoing responsibility, which extends throughout the duration of the trial and even after conviction. (See *People* v. *Garcia* (1993) 17 Cal.App.4th 1169, 1179 [22 Cal.Rptr.2d 545]; *Thomas* v. *Goldsmith* (9th Cir.

p. 3381, 87 L.Ed.2d at pp. 490-491] [holding that 'a constitutional error occurs, and the conviction must be reversed, only if the evidence is [both favorable and] material in the sense that its suppression undermines confidence in the outcome']; cf. *Strickland* v. *Washington* [(1984)] 466 U.S. [668,] 687-696 [104 S.Ct. at pp. 2064-2069, 80 L.Ed.2d 674] [holding that counsel's assistance is ineffective in violation of the Sixth Amendment, and the judgment must fall, only if counsel's performance is deficient and prejudicial].) [¶] It follows that harmless-error analysis under *Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065], with its standard of 'harmless beyond a reasonable doubt,' is not implicated. If the prisoner fails to show both the favorableness and the materiality of the evidence not disclosed by the prosecution, his custodian *need not* make any attempt to demonstrate that the prosecutorial nondisclosure was harmless beyond a reasonable doubt. Obviously, in such a situation, there is no 'error' to be found harmless. But if the prisoner succeeds, his custodian *cannot* make any attempt of this kind. Under such circumstances, there is an 'error' that is necessarily 'prejudicial.' That is because if the prisoner establishes 'a reasonable probability that, had the evidence been disclosed to the defense, the result . . . would have been different' [citations], that is to say, if he establishes a probability sufficient to 'undermine[] confidence in the outcome' [citations], as a matter of necessity he establishes the prosecutorial nondisclosure was *not* harmless beyond a reasonable doubt." (*In re Sassounian, supra,* 9 Cal.4th at p. 545, fn. 7, italics in original.)

1992) 979 F.2d 746, 749-750.) Because of Fitzpatrick's conduct, Cotsirilos did not know (1) the district attorney's office had decided to help Gonzalez avoid deportation, and (2) at the same time Fitzpatrick was making verbal representations that Gonzalez's prosecution was imminent, his correspondence revealed that decisions about prosecuting Gonzalez had not yet been made. (See fn. 9, *ante*.) Had Cotsirilos known this, he undoubtedly would have vigorously cross-examined on this issue and used it as powerful evidence in urging the jury to reject Gonzalez's testimony.

Similarly, as stated in Cotsirilos's declaration attached to the petition for writ of habeas corpus, had he known of the level of Jara's sophistication as a police informant, he would have more thoroughly cross-examined Jara and made additional discovery requests. Our evaluation of the significance of the undisclosed evidence must be based on the net or collective effect of the suppressed evidence, not on a series of independent materiality evaluations. (*Kyles* v. *Whitley*, *supra*, 514 U.S. at pp. 437-441 [115 S.Ct. at pp. 1567-1569].)

■ In sum, had the jury learned that Gonzalez and Jara—the two key witnesses against Kasim—were in fact even more beholden to the prosecution than was shown at trial, it is reasonably probable that Kasim could have obtained a different result; our confidence in the verdict is sufficiently undermined to warrant reversal. (See *Giglio* v. *United States*, *supra*, 405 U.S. at pp. 154-155 [92 S.Ct. at p. 766] [credibility of key government witness was important issue since government's case depended almost entirely on witness's testimony].)

B. *Presentation of False Testimony*

■ Kasim argues his conviction also was tainted by false testimony by Gonzalez and Jara that they (1) had not received any benefits or promises in exchange for their testimony and (2) expected to be prosecuted for their involvement in the attack on Mustafa.

The prosecutor's constitutional duty to correct false testimony is based on principles similar to those underlying the duty to disclose exculpatory evidence. In *Mooney* v. *Holohan* (1935) 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406], the United States Supreme Court first held that a prosecutor's use of false testimony could constitute a denial of due process. "[Due process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the

presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." (*Id.* at p. 112 [55 S.Ct. at p. 342].)

*Mooney* involved a knowing and intentional use of perjured testimony, which was related directly to the defendant's commission of the charged crime. Subsequently, the United States Supreme Court has expanded *Mooney* to cover perjury not suborned by the prosecutor (*Alcorta* v. *Texas* (1953) 355 U.S. 28 [78 S.Ct. 103, 2 L.Ed.2d 9]), perjured statements not dealing with a substantive element of the prosecution's case (*Napue* v. *Illinois* (1959) 360 U.S. 264 [79 S.Ct. 1173,3 L.Ed.2d 1217]), and situations where the prosecutor did not know the testimony to be false, provided the prosecutor should have had that knowledge (*Giglio* v. *United States*, *supra*, 405 U.S. 150).

Particularly instructive is *Napue* v. *Illinois*, in which a prosecution witness falsely testified he had not received any promise of lenient treatment in exchange for his testimony, and the prosecutor failed to correct the false testimony. The high court reversed the conviction.

"The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . .

" 'It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.' " (*Napue* v. *Illinois*, *supra*, 360 U.S. at pp. 269-270 [79 S.Ct. at p. 1177], quoting *People* v. *Savvides* (1956) 1 N.Y.2d 554, 557 [154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854-855].)

■ Also instructive is *Giglio* v. *United States*, *supra*, 405 U.S. 150, in which the high court held even when the trial prosecutor is not aware of a promised benefit made to a witness, the trial prosecutor is still obliged to

correct the witness's false testimony that there was no promise. "[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government. [Citation.] To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." (*Giglio* v. *United States, supra,* 405 U.S. at p. 154 [92 S.Ct. at p. 766].)

█ Here, there is no doubt that Gonzalez and Jara testified falsely about not receiving benefits before Kasim's trial. Assuming arguendo that Fitzpatrick, a prosecutor experienced in dealing with accomplice and informant witnesses, did not know about the full extent of benefits these witnesses had obtained because of prior cooperation with law enforcement, we can only conclude this is so because he adhered to an approach unlikely to uncover this information. Since it is not uncommon for an accomplice or informant witness to have suffered a prior criminal conviction or to have cooperated with law enforcement in return for leniency of some sort, a prosecutor cannot adopt a practice of "see no evil or hear no evil." Under these circumstances, the prosecution has an affirmative duty and cannot—by looking the other way—shirk its constitutional obligation to prevent prosecution witnesses from deceiving the jury. If the prosecution knows or should know that testimony was false, the prosecution cannot allow the false testimony of its witnesses to stand uncorrected. Here, there is an unusual wrinkle because defense counsel through his own enterprise uncovered the existence of some of these pretrial benefits and was able to at least partially impeach Gonzalez and Jara on cross-examination. Nonetheless, Fitzpatrick was able to vouch for the veracity of Gonzalez and Jara, the two key witnesses against Kasim as demonstrated by the following excerpt of his closing argument: "If there were any benefits to [Gonzalez] in the past that was exactly that, in the past. Don't forget that. This case is entirely different. Everything is on the table and you know that."

█ "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (*United States* v. *Agurs, supra,* 427 U.S. at p. 103 [96 S.Ct. at p. 2397], fn. omitted.) The same principle applies when the prosecution clearly should have known that the testimony was perjured.

In any event, there is no room for doubt that Fitzpatrick had decided to assist Gonzalez on the immigration matter by the time Gonzalez testified.

Fitzpatrick therefore had *actual* knowledge of this benefit and certainly had a duty to correct false testimony by his witness in this regard. Not only did he fail to do this, his no-benefit questions conveyed the impression these witnesses were testifying out of a sense of civic responsibility. Because Fitzpatrick's improper conduct seriously impacted the jury's ability to fairly evaluate the evidence, the judgment of the jury has been undermined, thus requiring reversal.

## C. *Argument to Jury About Prosecuting Gonzalez and Jara*

 As noted at the outset of our discussion, a referee's factual findings are given great weight when supported by substantial evidence. Here, the referee found that by the time of closing argument, Fitzpatrick had decided not to prosecute Gonzalez and Jara as originally contemplated by the district attorney's office. Accepting this factual finding as being established, it was misconduct on Fitzpatrick's part to tell the jury that these two accomplice-witnesses would be prosecuted after this trial. Again, since the testimony of Gonzalez and Jara was crucial to the prosecution's case against Kasim, the importance of Fitzpatrick's misrepresentation to the jury must be considered a material one, which deprived Kasim of a fair trial.[17]

Moreover, even without such a finding, the failure to disclose exculpatory evidence (see pt. II.A., *ante*) and the use of perjured testimony (see pt. II.B., *ante*) separately and collectively require reversal.

## D. *Conclusion*

Kasim has sustained his burden of proving the prosecution withheld critical discoverable evidence, presented false testimony and made misrepresentations in its closing argument to the jury.[18] Relief by habeas corpus is therefore warranted. (§ 1473.) However, we reject Kasim's request for outright dismissal. Dismissal of charges is an extraordinary remedy, which is reserved for the few cases where conduct by the prosecution has completely eliminated the possibility of a fair retrial. (See, e.g., *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818].) Certainly, the actions here cannot be condoned—and we have indicated that we do not in any manner condone them. However, as serious as the

---

[17]The Attorney General's argument that there was no misrepresentation in Fitzpatrick's closing argument because prosecution of Gonzalez and Jara was contemplated *only if* both Kasim and Miner were convicted is belied by Fitzpatrick's testimony at the evidentiary hearing disowning such a theory and the referee's factual findings.

[18]In light of this conclusion, we need not address Kasim's claims of prosecutorial misconduct regarding the prosecution's failure to turn over his check to and receipt from the bail bondsman as part of discovery.

prosecutorial misconduct was in this case, it was not sufficiently egregious to warrant a dismissal of the charges and a bar to reprosecution. The misconduct did not make a fair retrial for Kasim impossible. Nor can we say that Kasim "has effectively been acquitted of the offense in question." (*In re Martin* (1987) 44 Cal.3d 1, 53 [241 Cal.Rptr. 263, 744 P.2d 374] [even on habeas corpus when judgment determined to be void, petitioner generally subject to retrial].)

### III. *Appeal Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The petition for writ of habeas corpus is granted. The judgment is vacated and Kasim is remanded to the Superior Court of San Diego County. Upon finality, the clerk shall remit a certified copy of this opinion and order to the superior court for filing, and the Attorney General shall serve another copy thereof on the district attorney in conformity with section 1382, subdivision (a)(2). (See *In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9 [179 Cal.Rptr. 223, 637 P.2d 690].)

The remainder of the appeal is dismissed as moot.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied August 28, 1997.

---

*See footnote 1, *ante*, page 1360.