Filed 8/26/15  P. v. Jones CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060667 |
| v. | (Super.Ct.No. FVI1301024) |
| SAGE GOODMAN JONES, et. al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  John M. Tomberlin, Judge.  Affirmed as modified.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant, Sage Goodman Jones.

Reed Webb, under appointment by the Court of Appeal, for Defendant and Appellant, Julian Ian Bezada.

1

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Collette Cavalier and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants and appellants Julian Ian Bezada and Sage Goodman Jones of attempted first degree residential robbery (Pen. Code,[1] §§ 664, 211, count 1) and conspiracy to commit robbery (§ 182, subd. (a)(1), count 2).[2]  For count 1, the jury found true the allegation that defendants voluntarily acted in concert with two or more other persons in committing the attempted robbery (§ 213, subd. (a)(1)(A)), and for counts 1 and 2, the jury found true the allegation that a principal was armed (§ 12022, subd. (a)(1)).  Defendant Bezada was also convicted of being a felon in possession of a firearm (§ 29800, subd. (a), count 4), and he admitted a prison prior (§ 667.5, subd. (b)).[3]

Following the close of evidence at trial, defendants' counsel moved for a mistrial on the ground that the prosecution committed a *Brady*[4] violation by failing to disclose

---

[1]  All further statutory references are to the Penal Code.

[2]  Defendant Bezada is defendant Jones's stepfather.

[3]  The amended information also charges defendants with receiving stolen property (§ 496, subd. (a), count 3); however, the prosecutor did not submit this count to the jury.

[4]  *Brady v. Maryland* (1963) 373 U.S. 83, 87.

potential impeachment evidence regarding a police informant who testified during the prosecution's case-in-chief. The court denied the motion.

The court sentenced Bezada to six years for count 2, plus consecutive one-year terms for the firearm and prior prison enhancements, for a total of eight years in state prison. The court sentenced defendant Jones to six years for count 2, plus a consecutive term of one year for the firearm enhancement, for a total of seven years in state prison. Pursuant to section 654, the court imposed but stayed both defendants' three-year sentences for count 1 and Bezada's two-year enhancement for felon in possession of a firearm.

On appeal, defendants argue that the trial court erred in denying their motion for mistrial. They also argue, and the People concede, that their conduct credits should have been awarded pursuant to section 4019 as opposed to section 2933.1. We affirm the judgment, but direct the trial court to amend the minute orders and abstracts of judgment to reflect the correct number of conduct credits awarded pursuant to section 4019.

I.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The prosecution's case*

At trial, the prosecution presented the following evidence in the form of recorded statements by defendants and testimony of an informant, the informant's brother, the victim of the attempted robbery, and several police officers.

3

a. *The informant and the plan to commit robbery*

Johnny Crummie, who has worked as a paid police informant for over 15 years, testified that in April 2013, he and defendant Bezada were both attending the same class in Victorville.[5] Crummie told the class during introductions that he was from Compton, that he had been convicted of felonies, and that he had served time in prison on multiple occasions.

On April 8, 2013, Bezada approached Crummie during a break in class and told him that he (Bezada) had a robbery "gig" for them. Crummie had no intention of participating, but went along with the conversation and tried to get as much information about the robbery as possible so he could inform law enforcement. Bezada told Crummie they would rob a house that he had previously worked at in Oak Hills. He said it was owned by a couple that was "old and helpless, so [they] would kill them, and there would be nothing left." When he had worked at the house, he had seen money, guns, hunting equipment, stuffed deer heads on the walls, and a safe in a back room. The house sat "off by itself" on a cul-de-sac in a "quiet area [where] [n]o one would ever hear . . . so [they] could get away with it really quick."

Crummie asked for the address of the home but Bezada refused because he did not want Crummie to commit the robbery without him. Bezada asked Crummie if he was

---

[5] Although not disclosed to the jury, the record indicates that the class was a court ordered parenting class.

4

able to obtain guns for the robbery, but Crummie told him that he lived in Los Angeles and, because he was currently on parole, he could not chance bringing guns all the way to San Bernardino County.

After class ended, Bezada approached Crummie again to discuss the plan for the robbery and make sure Crummie was committed to going through with it. He told Crummie that he would obtain a gun. He wanted to do the robbery that day, but Crummie said he had to meet with his parole officer and that they should do it the following day.[6] Crummie told Bezada that he planned to bring his brother along for safety. Bezada did not like this idea because it meant another person to split the robbery proceeds with, but ultimately he decided that Crummie could bring his brother and that he would bring his "homeboy."

Crummie again asked Bezada for the address. Bezada said that he would give him the address later, when they were "ready to do it." Before leaving, Bezada gave Crummie his phone number and told him to call him later.

After this conversation, Crummie called one of his handlers, who told him to call the sheriff's department.[7] Ultimately, Crummie spoke with a detective at the Victorville

---

[6] Crummie testified that he lied to Bezada about having to meet with his parole officer so that he could inform law enforcement of Bezada's plan.

[7] Crummie had multiple "handlers," or contacts, at various agencies and had worked with this particular handler for 10 years.

5

Police Department about the planned robbery and provided him with all the information he had obtained during his conversations with Bezada.

The following morning (April 9, 2013), Crummie and his brother met with the detective at the Victorville Police Department.[8] They agreed on a plan to bring Bezada to a prearranged gas station where police would be waiting to arrest him.

b.  *Bezada's recorded statements to the informant*

Bezada and Crummie spoke to each other on the phone four times that day, and the police recorded each of these conversations.  The prosecution played the four April 9 conversations to the jury during trial.

The first call occurred during Crummie's meeting with the detective at the Victorville Police Department.  Crummie called Bezada on the number he had given him after class the day before.  When Bezada answered the phone, Crummie told him that he could do the robbery at 4:00 that afternoon and asked for the address so he could drive by the house.  Bezada responded, "Alright.  Well uh I'm trusting you, dog, not to hit it without me, bro."  Crummie replied, "Come on, bro.  I'm not gonna do it without you, bro.  You came to me with it."  Bezada did not deny that he had approached Crummie about the robbery.  Instead, he replied, "Alright.  Well, I'll give [the address] to you," and told Crummie where the home was located.  Bezada gave Crummie his address so that

---

[8]  Crummie testified that he had asked his brother to help him on this case for safety reasons because he believed the situation could become dangerous.

6

Crummie could pick him up at 4:00 p.m. Bezada also told Crummie that he had obtained a gun.

About an hour later, Crummie called Bezada from the prearranged gas station and told Bezada to meet him there. Bezada told Crummie that he had no way of getting to the gas station, and that he had not been able to get the gun as planned because his contact fell through. He said that he hoped Crummie had brought a gun "[j]ust in case." Crummie responded that when Bezada had approached him about the robbery he had said that he (Bezada) would bring a gun. Again, Bezada did not challenge Crummie's statement that he had been the one to approach Crummie about the robbery. He simply replied, "Yeah, I know."

At one point in the conversation, expressing frustration at not having access to a gun, Bezada said, "I don't know what to do. I'm stuck in like fucking the headlights, dude, like a reindeer." Crummie asked Bezada when he thought he would have it "all together" and told him that he was going to go back to Los Angeles if the robbery was not going to happen. Bezada responded that he "had everything together . . . the whole getup and everything," until his gun contact flaked. Bezada ended the conversation by saying that he was going to "call [his] other homeboy right now" to see if he would "lend [him] one."

Sometime later, Crummie and Bezada spoke on the phone again and Bezada told Crummie that he had obtained a gun. Bezada told Crummie to come pick him up. He

7

explained to Crummie, "[t]his is how it's gonna happen [¶] . . . . [¶] we gotta make this shit quick [¶] . . . [¶] you and your brother [] will take control . . . and uh tape homeboy up . . . we'll talk about it." In the last phone conversation played to the jury, Crummie told Bezada he was waiting in front of his house for him.

c. *Defendants' arrest*

At trial, both Crummie and his brother testified about what happened from the time they picked defendants up until the time of defendants' arrest.[9] As they neared Bezada's house, Bezada and defendant Jones emerged from bushes and approached Crummie's car. Bezada was carrying a duffel bag and got into the front passenger seat of the car. Jones was carrying a backpack and a jacket and got into the rear driver's side seat. Bezada told Crummie that he had a gun, and Crummie saw a gun in Jones's right waistband.

During the drive, Bezada instructed everyone that the robbery should only take seven minutes and that he did not care what happened to the people inside the house. He said that they would knock on the door, push their way in, kill the people inside, and take the money, jewelry, guns, and hunting equipment. Bezada opened his duffel bag and showed Crummie the tape and rope inside. Jones remained quiet during the car ride.

---

[9] Crummie's brother is not a police informant. He testified that he accompanied his brother to provide "moral support" and he received no compensation for taking part in the plan.

8

Crummie drove back to the prearranged gas station and he and his brother went inside on the pretext of needing to use the restroom. While they were inside, Bezada stepped out of the car. When the officers waiting at the station saw what appeared to be a black gun in Bezada's waistband,[10] they arrested him. The officers found in his possession two bandanas and a piece of paper with the address of the target house written on it. The officers also arrested Jones. In the backseat of the car, near where Jones had been sitting, they found a backpack containing a pair of gloves and a jacket with a loaded Springfield nine-millimeter gun inside. In the front passenger seat, they found a bag containing duct tape and a roll of welding wire.[11]

      d. *The recorded conversation between defendants*

The police escorted Bezada and Jones into the backseat of one of the patrol cars where, unbeknownst to defendants, the police had concealed a recorder. The conversation between defendants that ensued was played for the jury.

At the beginning of the conversation, Bezada asked Jones what the police talked to him about and Jones said, "[I] [t]old 'em that I just asked you for a ride. . . . I don't even really know you." Jones then told Bezada, "You ruined my life." He asked Bezada if

_____

[10] The gun was actually a replica Beretta nine-millimeter BB gun, but it did not have any red markings to indicate it was not a real gun and the officers that testified said they believed it was real when they first saw it.

[11] We know that these items were not previously in Crummie's car because the police searched his car before he drove to pick up Bezada and they did not find anything.

9

Crummie was a cop or a "snitch," and asked, "Why the fuck would you fucking trust him?"

Bezada told Jones to "just say that they threatened us . . . if we didn't give 'em the guns, because they were gonna go do a robbery . . . and . . . they threatened to fucking come to our house and rob us if we didn't comply with them." Jones later asked Bezada how much time he would do for possession of the gun, and said "[if] Kristen finds out that gun got caught on me, dude. My life's over . . . I'm gonna murder you in jail."

    e. *Defendants' statements to the police*

The same detective (sergeant, at the time of trial) who met with Crummie and his brother at the Victorville Police Department interviewed both defendants at the station after their arrest. He testified that Jones denied any knowledge of the gun in the jacket or of the robbery.[12] Jones claimed the jacket was already in the car when he got in and that the only reason he was in the car was to get cigarettes from the gas station.

Bezada told the sergeant that he "fucked up" because he had "trusted two black guys." He claimed that he had met one of them (Crummie) in a class. He said that Crummie had approached him about doing a robbery and had asked him if he could get a gun. Bezada claimed that at first he said he could obtain a gun, and that when he later

---

[12] The sergeant informed both defendants of their *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436.) The admissibility of defendants' statements is not at issue on appeal.

said that he could not, Crummie threatened to rob his house. Initially, Bezada said that Crummie had provided the address to the target house, but he eventually admitted that he provided the address because he had worked there before.

### f. *Testimony of the victim of the attempted robbery*

The victim of the attempted robbery testified at trial. He is 61 years old and lives at the address of the target house in Oak Hills with his wife. He testified that he hunts recreationally and that there are stuffed deer heads in the entryway of his home. He owns several guns, which he keeps in a safe located in his garage. In April 2013, there were up to 20 people coming in and out of his home because he was having work performed on his property.

### 2. *Defendants' motion for mistrial*

During the course of trial, the jury heard extensive evidence about Crummie's criminal record and his long history as a paid informant. Specifically, Crummie testified that he had been to prison multiple times and had been convicted of the following offenses: transporting cocaine (in 1992), felony forgery (in 1995), sex with a minor who was more than three years younger than him (in 2003), felony spousal abuse (in 2010), felony spousal abuse (in 2011), and evading the police (in 2011). In response to questions during direct and cross-examination, Crummie testified that he has been a paid informant for over 15 years and that he has relationships with approximately 20 different handlers. He admitted during cross-examination that he has testified over 50 times in

11

both state and federal court, that he makes his living by being an informant, and that he had been involved in "perhaps thousands of cases." He testified that he was paid $400 to bring this case to law enforcement's attention, but that this compensation was not contingent on his testimony.

On cross-examination, the sergeant testified that he and another officer had set Crummie's compensation at $400 for assisting the police on defendants' case. He also testified that before working with Crummie on this case, he was aware of Crummie's reputation in the San Bernardino County Sheriff's Department as being a "credible" informant.

At the close of evidence, defendants moved for a mistrial on the ground that the prosecution failed to provide possible impeachment material regarding Crummie's status as a confidential informant. Defense counsel pointed out two types of *Brady* material that they believed had been suppressed. The first type was "evidence within the deals that Mr. Crummie had done with the San Bernardino Sheriffs." Counsel stated that the defense was entitled to have the "information" that the sergeant had reviewed to be able to testify that Crummie had worked as an informant for the San Bernardino County Sheriff's Department before and was "credible." Counsel conceded that the prosecution had likely been unaware that Crummie had previously worked with the sheriff's department until the sergeant mentioned it during cross-examination; however, he argued

12

that the defense was "ambush[ed]" when the sergeant testified that Crummie was "credible."

The second type of *Brady* material related to Crummie's criminal history. Defense counsel informed the court that, the day before, they had discovered an appellate opinion from 2008 that described Crummie's prior convictions in a way that led them to believe Crummie had "basically lied or perjured his testimony" about his criminal history during defendants' trial.[13] Counsel explained that the appellate opinion described Crummie's prior offenses as " 'Gangs, drug cases, and sexual assaults,' *plural*." Because the appellate opinion mentioned more than one sexual assault, defense counsel argued that they were "standing here with a question mark as to what [Crummie's] real priors contain, and were they more than the five that we were provided with by the People?" Counsel argued that because of this late discovery (i.e., on the day before the last day of testimony), they were unable to adequately prepare their defense or cross-examine Crummie about his "checkered past and history as a [paid informant]."

The prosecutor responded that he had provided defense counsel with all of the information that he had regarding Crummie, which consisted of his name, criminal

---

[13] Counsel was referring to *People v. Ford*, 2008 Cal.App.Unpub. LEXIS 4876 [Fourth Dist., Div. Two] (*Ford*). Crummie had worked as an informant in *Ford* and had testified as a witness for the prosecution. The relevant portion of the opinion states that when Crummie had testified he had a lengthy history of drug crimes, gang involvement, credit card fraud, domestic violence, and sexual offenses, and that at the time of his testimony he was in jail on charges of spousal abuse and grand theft.

history, and the fact that he was a paid informant.[14] He was not aware of any issues with the criminal record he had given the defense, and offered to provide Crummie's "rap sheet" to the court for review. He stated that this was the first time defense counsel had asked for information about Crummie, even though the court had previously asked them during a pretrial conference why they had not made any discovery motions to obtain information about Crummie's past informant deals.

The court denied defendants' mistrial motion, stating that while the better practice is "to have all the information out here," there was nevertheless no "*Brady* material that was out there that . . . would have made a difference." The court concluded that any additional information about Crummie's history as a paid informant for the San Bernardino County Sheriff's Department would not have affected his credibility because Crummie had admitted to making a living as an informant for the past 15 years and "made it clear that he testified and made money in a whole bunch of different cases." It also concluded that any potential evidence of additional convictions was immaterial under the *Brady* standard for two reasons. First, additional convictions likely would not have made a difference to Crummie's credibility because he had already admitted to being "involved in every degree of crime." Second, even if additional convictions would have harmed Crummie's credibility, this difference would not have changed the outcome

---

**14** This statement from the prosecutor is the only information in the record regarding the information about Crummie that was disclosed during discovery.

of trial because defendants' guilt was corroborated by other sources, including defendants' own recorded statements.  In other words, Crummie's testimony was not the only evidence of defendants' guilt.

II.

ANALYSIS

1.  *Defendants' Brady violation claim*

Defendants argue that the trial court's denial of their motion for mistrial was error. As noted *ante*, defendants identified two types of allegedly suppressed *Brady* material to support their motion for mistrial:  (1) the information that the sergeant reviewed to be able to testify that the San Bernardino County Sheriff's Department had used Crummie as an informant before and that he was credible (the "informant history" evidence); and (2) the 2008 appellate opinion indicating that Crummie had more than one sexual assault conviction (the "additional conviction" evidence).  Because we conclude that this evidence was not suppressed or material to defendants' case, we hold that there was no *Brady* violation and, thus, the trial court did not err in denying the motion for mistrial.

a.  *Standard of review*

"[A] motion for mistrial should be granted only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' "  (*People v. Ayala* (2000) 23 Cal.4th 225, 282.)  An order denying a motion for mistrial is generally reviewed under the abuse of discretion standard.  (*People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved

15

of on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  We independently review the question of whether a *Brady* violation has occurred, while giving great weight to any trial court findings of fact that are supported by substantial evidence.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).)

> b.  *No Brady violation occurred at defendants' trial*

In *Brady*, the United States Supreme Court established that due process requires the prosecution to disclose evidence that is both favorable to the defendant and material on either guilt or punishment.  (*Brady v. Maryland*, *supra*, 373 U.S. 83, 87; *Salazar*, *supra*, 35 Cal.4th at p. 1042.)  A *Brady* violation occurs when three conditions are met: (1) the evidence was " 'favorable' " to the defendant, (2) the evidence was " 'suppressed by the State, either willfully or inadvertently,' " and (3) the evidence was "material" (i.e., its suppression was prejudicial).  (*People v. Lucas* (2014) 60 Cal.4th 153, 274 (*Lucas*).)

Evidence is favorable if it "either helps the defendant or hurts the prosecution." (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)  This includes evidence that reflects upon the credibility of material witnesses.  (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282; *Salazar*, *supra*, 35 Cal.4th at p. 1042.)  Here, the evidence was favorable because defendants argue that the informant history and additional conviction evidence would have impeached Crummie's credibility.  The issue is whether it was suppressed and material.

16

### i. *Suppression*

Evidence is suppressed only if the defendant was not aware of it and could not have become aware of it "through the exercise of due diligence." (See *Salazar*, *supra*, 35 Cal.4th at p. 1049 [where the evidence "is in a defendant's possession or is available to a defendant through the exercise of due diligence, then . . . the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence"]; see also *Lucas*, *supra*, 60 Cal.4th at p. 274, citing *People v. Morrison* (2004) 34 Cal.4th 698, 715 [" '[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery' "].) Moreover, even a discovery of evidence late in trial does not constitute suppression if the defense discovered the evidence while it had opportunity to cross-examine the witness about it. In *Lucas*, two days after a witness had testified for the prosecution, the prosecution discovered and gave to the defense a police report containing information directly contradicting part of the witness' testimony. (*Lucas*, at p. 273.) The court held that the police report was not suppressed because defense counsel "retained the ability to recall or subpoena [the witness] and impeach him directly with the report." (*Id.* at pp. 273-275.)

Here, defense counsel discovered the potential for the informant history and additional conviction evidence before the close of evidence at trial. Specifically, defense counsel discovered during cross-examination of the sergeant that Crummie previously worked with as an informant for the San Bernardino County Sheriff's Department. And

17

the day before that (i.e. the day before the close of evidence), defense counsel discovered the *Ford* opinion.  At that time, both Crummie and the sergeant had been dismissed subject to recall.  Thus, like in *Lucas*, there was no suppression because defense counsel could have recalled the witnesses and cross-examined them on those areas.  Defense counsel failed to do so.

### ii.    *Materiality*

Even if we assume that the alleged impeachment evidence was suppressed, it was nevertheless immaterial to the outcome of the case.  Evidence is material if there is " 'a reasonable probability its disclosure would have altered the trial result.' " (*People v. Whalen* (2013) 56 Cal.4th 1, 64.)  "[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " (*Strickler v. Greene*, *supra*, 527 U.S. at p. 290.)  " 'Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review.' " (*Whalen*, at p. 64.)  In other words, "there is no 'error' unless there is also 'prejudice.' " (*In re Sassounian*, *supra*, 9 Cal.4th at p. 545, fn. 7; see *ibid.* ["It follows that harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24, with its standard of 'harmless beyond a reasonable doubt,' is not implicated."].)

In *Salazar*, the California Supreme Court held that impeachment evidence concerning one of the prosecution's key witnesses was immaterial because, "even if [the

defendant] could have succeeded in impeaching [the witness], equivalent testimony was supplied by other witnesses." (*Salazar*, *supra*, 35 Cal.4th at p. 1052.) In concluding that it was unlikely that the evidence would have affected the outcome of trial, the court noted that defendant's own statements and actions during the criminal investigation established his guilt. (*Id.* at p. 1051.)

Here, Crummie's testimony regarding his conversation with Bezada outside of class about the robbery was not the only evidence establishing that defendants were guilty of attempted robbery. Most of the evidence of defendants' guilt was "supplied by other [sources]," such as their own statements. (*Salazar*, *supra*, 35 Cal.4th at p. 1052.)

During the recorded phone conversations between Crummie and Bezada, the jury heard Crummie twice reference the fact that Bezada had approached him about the robbery. At no point in the conversations did Bezada challenge Crummie's statements or deny that the robbery had been his idea. These conversations established that Bezada: had approached Crummie about the robbery, had the address of the target home, had given Crummie instructions on how the robbery would play out, and had been trying to obtain a gun. Additionally, the jury heard the recorded conversation in which both defendants made incriminating statements about trying to minimize their involvement in the attempted robbery. While sitting in the back of the patrol car, Jones admitted to possessing a gun, and he and Bezada discussed how they could convince the police that the robbery was Crummie's idea.

19

Aside from defendants' own statements, other evidence independent from Crummie's testimony established defendants' guilt. The prosecution established, through photographs and the testimony of police officers, that when defendants were arrested, they were in possession of a gun and equipment that could be used in a home invasion robbery.

And finally, the likelihood was extremely low that evidence of additional convictions or of his history as an informant would materially affect Crummie's credibility. (See *Salazar*, *supra*, 35 Cal.4th at p. 1051 ["it is unlikely the [evidence] . . . would even have been viewed as significant impeachment evidence"].) Defense counsel's cross-examination had already established that Crummie was a career informant with a significant criminal history. This testimony alone was enough to prompt the jury to question Crummie's credibility. Any credibility Crummie did have was based, not on his character, but on the fact that his testimony was corroborated by so much other evidence presented at trial. Thus, because there was significant evidence of defendants' guilt independent of Crummie's testimony, and because his credibility was already damaged, we conclude that the alleged impeachment evidence is not material to defendants' case and that no *Brady* violation has occurred.

### c. *Defendants' arguments do not affect our conclusion*

### i. *Standard for materiality*

Defendants contend that the court must not focus on the "evidence that allegedly corroborated [Crummie's] testimony" when making its materiality determination, but rather must consider "any adverse effect" that the impeachment evidence could have had on their case. However, the standard for materiality is not whether the suppressed evidence had "any adverse effect" on a defendant's case, but whether there is a "reasonable probability" that the outcome would have been different had the evidence not been suppressed. (See *Strickler v. Greene*, *supra*, 527 U.S. 263, 280, 289.) Even where counsel's ignorance of suppressed impeachment evidence "made [the] conviction more likely," the evidence is not material if the record "provides strong support for the conclusion that [the defendant] would have been convicted . . . even if [the witness] had been severely impeached." (*Id.* at pp. 289, 294.) Here, defendants' recorded statements alone provide strong support for conviction, regardless of Crummie's credibility.

Moreover, defendants have pointed to no *specific* impeachment evidence regarding Crummie. Instead, they point to a potential additional sexual assault conviction and "agreements and facts involving other cases in which Crummie had testified." Presumably, defendants hope to find impeachment material in those "agreements and facts"; however, such a vague description is not enough to demonstrate the "reasonable probability" of a different outcome necessary for a finding of materiality. (*Strickler v.*

21

*Greene*, *supra*, 527 U.S. at pp. 280, 289 [in order to find evidence material, a reviewing court must find that there is a "reasonable probability" that the outcome would have been different had the evidence not been suppressed].) Because defendants have failed to demonstrate that there is any impeachment evidence that was material to the outcome of their case, we must reject their *Brady* claim.

### ii. Inapplicable materiality cases

Defendants argue that the holdings in *People v. Kasim* (1997) 56 Cal.App.4th 1360 (*Kasim*) and *In re Pratt* (1999) 69 Cal.App.4th 1294 dictate a different materiality result. Because these cases are distinguishable, we disagree.

In *Kasim*, the prosecution failed to disclose evidence that its two main witnesses had previously received leniency in exchange for their cooperation with law enforcement, and that they were receiving leniency in the present case. (*Kasim*, *supra*, 56 Cal.App.4th at p. 1382.) The court held that this evidence was material because: (1) as accomplices receiving leniency, the witnesses had a motivation to testify favorably for the prosecution, and (2) one of the witnesses was "essential" to the prosecution because he was the only person who witnessed the crime. (*Ibid.*) Here, unlike *Kasim*, Crummie was not an accomplice and his testimony was not essential to the prosecution's case. The prosecution had extensive evidence of defendants' guilt, independent of Crummie's testimony.

22

In *In re Pratt*, the jury was not informed that the prosecution's key witness—the man to whom the defendant had allegedly confessed—was an informant and had a "[close] cooperative relationship" with law enforcement. (*In re Pratt*, *supra*, 69 Cal.App.4th at pp. 1316, 1322.) Here, the jury knew of Crummie's long history as an informant and, more importantly, his testimony was not the strongest evidence of defendants' guilt.

### iii. *Materiality with respect to defendant Jones*

In his reply brief, Jones argues that there is not enough evidence independent of Crummie's testimony to link him to the robbery. Jones denies any knowledge of the weapon or the robbery, and claims that his role was "passive" and "based solely on his relationship with Bezada."

Jones mischaracterizes the evidence against him. His own statements to Bezada during their conversation in the patrol car establish that he possessed the gun, as does the fact that the police found it in a jacket on the backseat of Crummie's car where Jones had been sitting. The testimony of Crummie's brother and the officers who arrested Jones establish that Jones had also been carrying a backpack containing gloves. After hearing evidence that Jones was carrying gloves and a loaded gun, the jury could readily disbelieve his explanation that he was just going to the gas station to get cigarettes. We therefore reject Jones's argument that the incriminating evidence in this case relates only to Bezada.

23

### iv. *Misinterpretation of the trial record*

Lastly, we address an argument defendants raise for the first time on appeal. Defendants claim that the prosecution suppressed evidence that "Crummie had previously provided false <u>information</u>—i.e. perjured testimony—in a 2008 Riverside County case." This argument appears to stem from a misreading of the transcripts of defendants' motion for mistrial. We see no evidence in the record that defense counsel argued Crummie had lied in the 2008 case.

As detailed in section I.2, during oral argument on their motion for mistrial defense counsel informed the court that *Ford*, an appellate opinion from 2008, lead them to suspect Crummie had been convicted of more sexual offenses than he had admitted during his testimony. In explaining their discovery of *Ford*, Bezada's counsel stated, "[Jones's counsel] called me I believe at 8:30 last night because he had brought up a case from 2008 in Riverside County where Mr. Crummie was the CI informant." Bezada's counsel told the court that after reading *Ford*, "it was agreed that [Crummie] had basically lied or perjured his testimony." This statement is likely the source of the confusion about the perjury issue on appeal. Appellate counsel appears to read the statement as: "it was agreed [*in Ford*] that [Crummie] had basically lied or perjured his testimony [*in Ford*]"; whereas, context establishes that the statement should read: "it was agreed [*among defense counsel after reading Ford*] that [Crummie] had basically lied or perjured his testimony [*in this case*]."

24

When asked to elaborate on *Ford*, Bezada's counsel explained that because "[t]he appellate opinion clearly says, 'Gangs, drug cases, and sexual assaults,' plural. . . . We are still standing here with a question mark as to what [Crummie's] real priors contain, and were they more than the five that we were provided with by the People?" From this response, the court determined that counsel was arguing that "there might have been another offense that [Crummie] was convicted of that [defense counsel] didn't know about"—*not that* Crummie had perjured his testimony in *Ford*. Moreover, defense counsel never corrected the court on this point or stated that they had instead meant that they believed Crummie had perjured his testimony in *Ford*. Thus, we conclude that defendants' claim on appeal that Crummie had previously committed perjury is a misreading of the record below.

2. *Conduct credits*

Defendants contend that they should have been awarded 158 days of conduct credit for presentence custody under section 4019 instead of 48 days under section 2933.1. The People correctly concede this issue.

Defendants were sentenced to six years for conspiracy to commit robbery, and their sentences for attempted robbery were stayed pursuant to section 654. The minute orders dated February 24, 2014, and the abstracts of judgment for both defendants reflect that their 48 days of conduct credit were awarded pursuant to section 2933.1, which imposes a 15 percent limit on conduct credits " 'where the . . . current conviction is a

25

*violent* felony listed in section 667.5.' " (*In re Mitchell* (2000) 81 Cal.App.4th 653, 656.) However, defendants' conduct credits should not have been calculated pursuant to section 2933.1 because that section does not apply to conspiracy or attempt, as neither crime is a violent felony listed in section 667.5. (See *In re Mitchell*, at p. 656 [§ 2933.1 does not apply to conspiracies]; *People v. Reed* (2005) 129 Cal.App.4th 1281, 1284-1285 & fn. 1 [except for attempted murder, an attempt to commit a crime listed in § 667.5, subd. (c), is not a violent felony].)

Instead, their conduct credits should have been awarded pursuant to section 4019, which permits defendants to earn two days credit for each four-day period of confinement in local custody. (Pen. Code, § 4019, subds. (b), (c); see also § 4019, subd. (f) ["if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody"].) Section 4019 has been amended multiple times. The most recent version of this section applies only to defendants whose crimes were "committed on or after October 1, 2011," and thus applies to defendants, whose crimes were committed in April 2013. (§ 4019, subd. (h).) Awarding conduct credits under section 4019 results in a total of 158 days.[15]

---

[15] We reach this number by dividing the days of actual confinement (319) by four, rounding the quotient down to the nearest whole number (79), then multiplying by two (158). (See *People v. Chilelli* (2014) 225 Cal.App.4th 581, 588, citing *People v. Dieck* (2009) 46 Cal.4th 934, 943 ["conduct credits are given in two-day increments and no rounding up is permitted"].)

We have the inherent power to correct clerical errors in abstracts of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Accordingly, we will direct preparation of amended abstracts of judgment for each defendant reflecting an award of 158 days of conduct credit under section 4019.

## III.

## DISPOSITION

The judgment is modified to set presentence credit for 477 days, consisting of 319 actual days and 158 days of section 4019 conduct credit. The superior court clerk is directed to prepare new minute orders and amended abstracts of judgment for both defendants reflecting the custody credit modifications. The superior court clerk is then directed to forward certified copies of the new minute orders and amended abstracts to the Department of Corrections and Rehabilitation. The judgment is affirmed as modified.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

KING
J.

27