Filed 12/9/25  P. v. Wilson CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ZURI A. WILSON,<br><br>    Defendant and Appellant. | A170683<br><br><br>(San Francisco City and County Super. Ct. Nos. CRI-13028170, SCN225664) |

In 2021, we reversed Zuri A. Wilson's murder conviction based on the prosecution's unlawful withholding of exculpatory evidence under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). (See *People v. Wilson* (Jan. 19, 2021, A157230) [nonpub. opn.] (*Wilson*).)  On remand, after the trial court denied Wilson's motion to dismiss the indictment based on the *Brady* error, a jury convicted Wilson in a new trial.  Wilson now asserts that, to remedy the *Brady* error, the court should have either dismissed the indictment or, at a minimum, issued an instruction informing the jury about the prosecution's misconduct.  Further, he contends that the trial court abused its discretion in allowing the prosecution's ballistics expert to opine that cartridge casings found at the crime scene were fired from a gun found at an apartment associated with Wilson.  We affirm.

1

# BACKGROUND

## 1.

The background facts are primarily taken from this court's unpublished opinion in *Wilson, supra*, A157230. In 2019, Wilson was tried and convicted for the murder of Shawnte Otis, who was shot and killed by two assailants outside a public housing project in San Francisco. (*Ibid.*; See Pen. Code, § 187, subd. (a)[1].)

The victim's aunt witnessed the shooting and was able to describe one of the two shooters: a light-skinned black male who was 5 feet 9 inches to 6 feet 1 inch tall. Physical evidence from the scene indicated that the shooters used a nine-millimeter pistol and a .45-caliber handgun with RWS brand ammunition. Shortly after the shooting, an eyewitness reported seeing two men run to a charcoal-colored Nissan parked nearby and drive away.

Wilson came to the police's attention because he was recorded on a surveillance video driving a gray Nissan near the crime scene a couple hours before the shooting. The police subsequently concluded from his cell phone records that his phone was in the vicinity of the shooting the same afternoon and that the phone left the area after the shooting. Searches of an apartment on Montoya Street in San Pablo, which the police believed was associated with Wilson, turned up a nine-millimeter pistol as well as .45-caliber RWS brand bullets. The apartment had multiple beds and closets, and a lease, bills, and other documents seized by the police contained the names of several individuals other than Wilson.

At his trial, Wilson argued that the prosecution's evidence was entirely circumstantial and failed to prove that he was one of the assailants. Wilson, a light-skinned black male who is 5 feet 7

---

[1] Undesignated statutory references are to the Penal Code.

inches tall, did not entirely match the description given by Otis's aunt. The prosecution introduced no physical evidence that connected him to the crime. DNA testing on the nine-millimeter gun and the RWS ammunition excluded Wilson as a source of the DNA. Instead, the DNA of one of his associates, Vernon C., was found on the nine-millimeter pistol and the DNA of an unknown female was found on the bullets. Further, although Wilson sometimes stayed at the Montoya Street apartment, there was evidence that other people had access to the apartment, including Vernon C. The police never identified the second shooter.

**2.**

In his earlier appeal, we reversed Wilson's conviction because the prosecution's failure to disclose exculpatory evidence until halfway through the trial prejudiced his case and violated his due process rights under *Brady*, *supra,* 373 U.S. 83. (*Wilson*, *supra*, A157230.) The evidence withheld by the prosecution consisted of eight pages of the lead police investigator's chronological report dating from late 2013 and 2014, which detailed steps taken to investigate the shooting. (See *Wilson*, *supra,* A157230.)

Our 2021 decision held that entries in the chronological report relating to three areas of investigation were both favorable to Wilson and material to his case. (See *Wilson*, *supra*, A157230.) First, the chronological report contained evidence that another individual, Quinten M., had a motive to kill Otis based on an ongoing, violent feud between the two. (*Ibid*.) A San Francisco Police Department sergeant believed that, a few months before Otis was murdered, Quinten M. had hired two shooters, Stephone B. and David H., to murder Otis's cousin in San Francisco. (*Ibid*.) Police believed that Quinten M. ordered the hit on Otis's cousin in retribution for Otis's murder of Quinten M.'s cousin. (*Ibid*.) The police excluded Stephone B. and David H. as suspects in Otis's killing, however, because cell phone numbers they had

been using five months earlier were not documented as being in the vicinity at the time of the crime. (*Ibid.*)

Second, the chronological report contained entries about a suspect named Jacque B., another associate of Quinten M.'s, who matched the description of the shooter provided by Otis's aunt. (See *Wilson, supra,* A157230.) Jacque B. was known to use a nine-millimeter pistol with an extended magazine, and a confidential informant had reported that Jacque B. was the second shooter along with Wilson. (*Ibid.*) The lead investigating officer wrote in the chronological report: " 'It should be noted that Jacque B[.] fits the description of the 2nd shooter, which is unique as the 2nd shooter was tall, skinny, and a light skinned [black male]. The 2nd shooter also used a 9mm pistol with an extended magazine.' " (*Ibid.*)

Third, the chronological report contained the name and address of Kenneth L., one of the leaseholders of the Montoya Street apartment, whom the defense had been unable to locate by the time of the first trial. (See *Wilson, supra,* A157230.) Kenneth L. had told police that he had sublet the apartment to a woman who provided access to Wilson, and he provided the woman's name. (*Ibid.*)

The evidence of other suspects and the tenants of the Montoya Street apartment withheld by the prosecution could potentially have been used by the defense to counter the prosecution's case on the identity of the shooters and undermine the prosecution's theory that the nine-millimeter pistol belonged to Wilson. (See *Wilson, supra,* A157230.) But by the time the information was disclosed in 2019, in the middle of the trial, we held, "the prosecution had already presented 16 of its 19 witnesses, and it was too late for the defense to track down multiple leads and multiple individuals, at least one of whom was dead, and reconfigure the defense's theory of the case midstream." (*Ibid.*) Given the heavily circumstantial nature of

4

the prosecution's case, with no motive, no DNA evidence connecting Wilson to the crime, and no second shooter, we held that the withholding of the evidence until mid-trial undermined our confidence in the outcome of the trial. (*Ibid.*) As a result, we reversed the judgment and remanded the case for further proceedings in the trial court. (*Ibid.*)

**3.**

Under section 1262, the reversal of a judgment against a criminal defendant is "deemed an order for a new trial, unless the appellate court shall otherwise direct." On remand, however, Wilson filed a motion to dismiss the indictment with prejudice. He asserted that because the prosecution's delay precluded him from effectively investigating the exculpatory material at issue, it was impossible for him to receive a fair trial, so "dismissal [wa]s the only appropriate remedy." He also asserted that dismissal was necessary because the prosecution's withholding of the evidence constituted " 'outrageous government misconduct.' " The People argued in opposition that the delayed disclosure was unintentional and a new trial is the proper remedy for a *Brady* violation. The trial court denied the motion to dismiss, reasoning that Wilson had failed to justify such an "extreme sanction."

Wilson also filed a motion to exclude expert testimony that cartridge casings recovered from the crime scene were fired from the nine-millimeter gun found in the Montoya Street apartment. He argued that firearm toolmark evidence—based on comparison of physical markings left on expended cartridge casings by guns—is not generally accepted by the relevant scientific community and is therefore inadmissible under the test in *People v. Kelly* (1976) 17 Cal.3d 24 for expert opinions that are based on new scientific techniques. As relevant here, he also contended that the prosecution expert's opinion that the recovered cartridges were fired from a specific gun is not supported by the material relied upon by the expert, and so is inadmissible under

5

Evidence Code sections 801, subdivision (b), and 802. Wilson's motion relied on detailed declarations from two experts as well as academic studies criticizing the validity of firearm toolmark analysis based on concerns including the lack of scientific studies documenting the underlying theory, the employment of subjective criteria, and the error rate.

In opposing Wilson's motion, the People argued that their expert's opinion was supported by accepted techniques and they submitted a competing expert declaration supporting the validity of firearm toolmark analysis. In addition, the People represented that their ballistics expert would not state their opinions to any specific degree of scientific or statistical certainty, make claims that their opinion is "infallible," or "use the unqualified term 'match.' " Further, the People asserted that their expert would "*not* testify that their opinion 'is to the exclusion of all other firearms,' instead, their testimony will be that they '*cannot* exclude all other firearms,' as they have not tested every firearm in the world."

The trial court accepted the People's proposed limitations on the scope of the expert's testimony and denied Wilson's motion.

The second trial, as described by Wilson, was largely "a repeat of the first" trial. As relevant here, Megan Pytlik, the People's expert firearm and toolmark examiner, testified about her examination of the nine-millimeter cartridge casings recovered from the crime scene. After comparing one of those casings to casings produced from test-firing the nine-millimeter pistol from the Montoya Street apartment, she testified that it was her subjective opinion that the casings were fired from the same gun. The defense did not put on any new evidence based on the disclosure of the information in the chronological report.

The jury in the second trial found Wilson guilty of first degree murder (§ 187, subd. (a); count one) and unlawful

possession of a firearm by a felon (§ 29800, subd. (a)(1); count two).[2]  As to count one, the jury found true the allegations that Wilson personally and intentionally discharged a firearm and personally used a firearm in the commission of the offense (§§ 12022.53, subd. (d), 12022.5, subd. (a)); the jury also found true the alleged special circumstance that the murder was committed by means of lying in wait (§ 190.2, subd. (a)(15)).

The trial court sentenced Wilson to life without the possibility of parole as to count one and a consecutive term of 25 years to life for the firearm allegation pursuant to section 12022.53, subdivision (d).  The court struck the additional firearm allegation pursuant to section 12022.5, subdivision (a).  As to count two, the court imposed but stayed the term of two years in prison.

## DISCUSSION

### A.

Wilson challenges the trial court's denial of his motion to dismiss the indictment based on the prosecution's *Brady* error. Whether we review the issue independently or for abuse of discretion, we conclude that the trial court correctly denied the motion.  (Compare *People v. Uribe* (2011) 199 Cal.App.4th 836, 857 (*Uribe*) [independently reviewing the trial court's granting of a motion to dismiss for outrageous government misconduct on remand after appellate reversal for *Brady* error] with *People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 445 [reviewing motion to dismiss for prosecutorial misconduct for abuse of discretion] and *People v. Jenkins* (2000) 22 Cal.4th 900, 951 (*Jenkins*) [recognizing that "courts have broad discretion in determining the appropriate sanction for discovery abuse"].)

---

[2] For purposes of count two, Wilson had admitted to having prior felony convictions.

7

**1.**

Wilson asserts that "a retrial is inadequate to resurrect appellant's right to a fair trial" and "[t]he only fair remedy at this point is dismissal."

When the prosecution has committed a *Brady* violation, the trial court has discretion to determine an appropriate remedy to ensure that the defendant receives a fair trial. (See *People v. Fultz* (2021) 69 Cal.App.5th 395, 432 (*Fultz*) [after affirming the trial court's findings of *Brady* error and other prosecutorial misconduct, remanding the case to the trial court "because it is in the best position to fashion a remedy adequate to ensure defendant's fair trial"]; see also *Jenkins, supra*, 22 Cal.4th at p. 951.) Although a new trial is usually the most serious remedy for a *Brady* violation, additional or alternative remedies may be necessary where a new trial, without more, will not ensure that the trial will be a fair one. (See *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1382, 1387 (*Kasim*); *Virgin Islands v. Fahie* (3d Cir. 2005) 419 F.3d 249, 254-255). For example, outright dismissal may be appropriate in *Brady* cases where a fair trial is impossible due to the prosecution's "gross and intentional" misconduct. (*People v. Garcia* (1993) 17 Cal.App.4th 1169, 1183; see *Fultz*, at p. 431; see also *People v. Ramirez* (2006) 141 Cal.App.4th 1501, 1503, fn. 1 [recognizing that "bad faith *Brady* errors may warrant dismissal"]; *Uribe, supra*, 199 Cal.App.4th at p. 841 ["A court may dismiss an information in an extreme case to address outrageous governmental conduct"]; *Jenkins*, at p. 951 [recognizing that "appropriate" sanctions for the prosecution's suppression of evidence may include dismissal].) Section 1054.5, subdivision (c), which addresses sanctions for discovery violations in a criminal case, similarly recognizes the "judicial power to dismiss charges for a *Brady* violation." (*People v. Gutierrez* (2013) 214 Cal.App.4th 343, 352.)

8

However, "[d]ismissal of charges is an extraordinary remedy . . . reserved for the few cases where conduct by the prosecution has completely eliminated the possibility of a fair retrial." (*Kasim, supra*, 56 Cal.App.4th at p. 1387; see *United States v. Pasha* (D.C. Cir. 2015) 797 F.3d 1122, 1139 (*Pasha*) ["dismissal is appropriate only as a last resort, where no other remedy would cure [the] prejudice against a defendant" caused by a *Brady* violation]; *Mendibles v. Superior Court* (1984) 162 Cal.App.3d 1191, 1198 (*Mendibles*) ["lesser sanctions must be utilized by the trial court," in lieu of dismissal, "unless the effect of the prosecution's conduct is such that it deprives defendant of the right to a fair trial"].) Remedies for *Brady* error short of dismissal may include, in the context of a new trial, striking prosecution evidence, excluding a prosecution witness, instructing the jury about the prosecution's misconduct, levying a monetary sanction, or other mitigating measures. (*Pasha*, at p. 1139; *United States v. Cloud* (9th Cir. 2024) 102 F.4th 968, 981; *Jenkins, supra*, 22 Cal.4th at p. 951.) Similarly, where a party has improperly withheld evidence in violation of section 1054.5, the court may order remedies including "delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter," instructing the jury about the untimely disclosure, "or any other lawful order." (§ 1054.5, subd. (b); see also *Mendibles*, at p. 1198 ["in the exercise of its discretion the court may consider a wide range of sanctions which our courts have imposed in response to prosecutorial violation of discovery orders"]; CALJIC No. 2.28 ["Failure to Timely Disclose Evidence"].)

Here, in denying the motion to dismiss, the trial court properly recognized that "[t]he remedy of dismissal . . . is extraordinary," concluding that it requires "some showing . . . beyond what has been made here to justify that extreme sanction." Wilson does not assert that the violation here was intentional or in bad faith, nor would the record support such a

9

conclusion.  When the trial court conducted a hearing, during the first trial, on the circumstances of the prosecution's delayed disclosure, the court found no evidence that the prosecution intentionally withheld evidence, and Wilson's former trial counsel agreed.

Even accepting for the moment that there may be circumstances short of bad faith *Brady* error in which dismissal is an appropriate remedy, we are unpersuaded that the record here justifies dismissal.

Wilson's argument for dismissal rests on the premise that once the withheld pages of the chronological report were disclosed in April 2019—three years after the prosecution became aware of the material—the information was stale and effective investigation of any potential leads was impossible for purposes of a retrial.  But the record provides weak support for Wilson's premise.  In support of his motion to dismiss, Wilson submitted a two-page declaration from a defense investigator, Keith McArthur, stating that, by 2022, he was able to locate Kenneth L., a tenant at the Montoya Street apartment, and Jacque B., a potential suspect, but Kenneth L. had no additional information to share about his former subtenant and Jacque B. declined to cooperate with the investigation.  Without additional information from Kenneth L. about his subtenant, McArthur was unable to locate her.  Further, McArthur was unable to locate Stephone B., one of the two alleged assassins hired by Quinten M., and the other assassin, David H., had died in 2016.  Based on this evidence, Wilson asserts that it was "impossible" to effectively investigate the leads from the chronological report.

Although the passage of time can make it more difficult to effectively investigate sources of exculpatory evidence, McArthur was able to speak to two key witnesses—Kenneth L. and Jacque B.  Even though the interviews did not turn out to be fruitful, it does not appear that either witness asserted an inability to recall

10

the relevant facts.  Nor is there reason to believe in the circumstances here that Jacque B., as a potential suspect, would have been more likely to cooperate had the defense team been able to contact him before the first trial.  And as Wilson's attorney candidly acknowledged in the trial court, it would not be realistic to expect that David H. and Stephone B.—even if the defense were able to interview them—would simply confess to the crime, rather than invoking their right to remain silent.

Moreover, apart from McArthur's abbreviated declaration, the record contains a dearth of information about investigative avenues Wilson pursued based on the chronological report.  Wilson has not pointed to any evidence that effective investigation of those leads, beyond the limited efforts described in McArthur's declaration, was impossible based on the passage of time.  Once the withheld records were disclosed, it was the defense's obligation to conduct a diligent investigation prior to any retrial.  (Cf. *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 715 [" 'when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.' "].)

The record here indicates that, after the withheld portions of the chronological report were first disclosed in 2019, the People made the entire police file available to Wilson's defense team in October 2021, over two years before the 2024 retrial.  Wilson's attorneys reviewed the police file and received copies of all materials they flagged.  In addition, the People provided information to the defense about Quinten M.'s whereabouts, as well as information about a female associate of his.

At the time of the *Brady* hearing in Wilson's first trial, counsel asserted to the trial court that had they received the information about David H. and Stephone B. prior to trial, apart from speaking to them, the defense "would have spoken to the

11

police[,] . . . gotten their RAP sheet and investigated the homicide" allegedly connected to the feud between Otis and Quinten M. "and see where it went." Defense counsel represented that "[a]s a defense lawyer, I would look to [the] other [suspects]. And if police had reason to believe he could be the second killer, I would want to push for discovery. We'd bring discovery motions. We would do what we could do to flush it out on. . . all three of these [suspects]. . . . [¶] Why is he a suspect to the police and why did he stop being a suspect? Who is he? Who is he related to? Is he connected to this area of the city, this project?"

In our 2021 opinion, we noted, with respect to the team of assassins associated with Quinten M., that "[t]he information would have allowed the defense to discover the police reports and track down witnesses. In addition, it would have enabled the defense to investigate whether the modus operandi, location, physical descriptions of the men hired by Quinten M. or other circumstances of the cousin's murder provide circumstantial evidence that the same perpetrators were involved here." (*Wilson*, *supra,* A157230.)

Further, the withheld pages of the chronological report contained numerous entries about investigative steps that the lead investigating officer took, particularly with respect to Jacque B., including searches conducted on his residence and phone, interviews with his girlfriend, and information about his girlfriend's phone and social media accounts as well as Jacque B.'s social media account. The chronological report also noted information about persons allegedly murdered as part of Otis's feud with Quinten M., including specific dates, victim's names, and locations, as well as the names of the police officers who provided the information to the lead investigating officer. All of this information should have been accessible to Wilson's defense

team, either as part of the police file they reviewed or through other records requests to law enforcement agencies.

Despite the availability of numerous potential investigative avenues apart from speaking to David H. and Stephone B. themselves, the record lacks concrete evidence of any other avenue that was closed to Wilson, notwithstanding diligent efforts, because of the prosecution's delayed disclosure. The record does not reveal whether no efforts beyond those described in McArthur's declaration were undertaken by the defense, whether further investigative steps were taken but the additional information obtained was not helpful to Wilson's defense, or whether further efforts led to dead ends due to the passage of time. Under these circumstances, the record falls short of establishing that a fair trial was impossible because the prosecution's delay prevented Wilson from conducting an effective follow-up investigation based on the withheld evidence. The trial court did not err in denying the motion to dismiss.

**2.**

In the alternative, Wilson argues that the trial court should have issued a curative instruction that informed the jury of the prosecution's *Brady* violation. (See, e.g., CALJIC No. 2.28.) However, Wilson never requested a special jury instruction in connection with his second trial, so the claim is forfeited[3] (See

_____

[3] Wilson's reply brief argues that even though his attorney never requested the instruction at issue here, the trial court had a sua sponte duty to issue it because "[h]aving rejected the request for dismissal, it was obligated to find some other remedy" for the *Brady* violation, and the trial court could not "simply decide to do nothing, as this trial court did." But Wilson mischaracterizes the trial court's action. Although the trial court denied the request for a dismissal, the court afforded Wilson a remedy in the form of a new trial. Further, Wilson does not argue on appeal that we can review the instructional claim

13

*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1105 [explaining that "the burden of requesting supplemental . . . instructions falls on the defendant, and failure to request such instructions waives the contention of error"].) In a supplemental brief, Wilson contends that his trial lawyer rendered ineffective assistance by failing to request a jury instruction on the *Brady* violation. Based on the record before us, we disagree.

To prevail, Wilson must show that his attorney's performance was deficient and that the error prejudiced his defense, depriving him of a fair trial. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687.) But ineffective assistance of counsel claims rarely succeed on direct appeal because the appellate record seldom reflects trial counsel's reasoning for an action or omission. (See *People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).) In a direct appeal, the defendant must point to "affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' " for the challenged action or omission. (*Ibid*; see also *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267 (*Mendoza Tello*).)

Wilson argues that the trial court should have instructed the jury that the prosecution violated his constitutional rights by withholding evidence from the defense, and that "the evidence the prosecution failed to disclose suggested other suspects had a motive to kill [Otis] and showed the possibility that the defendant was not involved in this homicide."[4] As Wilson notes, his trial

---

despite his forfeiture under the substantial rights doctrine. (See, e.g., *People v. Choyce* (2025) 18 Cal.5th 86, 107-108.)

[4] Wilson asserts that "the trial court should have instructed the jury that, 1) the prosecution had a duty to provide discovery in a timely manner, that they violated that duty and withheld evidence from the defense for a period of three years, 2) that this dereliction of duty violated the defendant's right to due process and a fair trial, 3) that the evidence the prosecution failed to disclose suggested other suspects had a motive to kill [Otis] and

counsel should have known that a jury instruction was a potential remedy for *Brady* error because his prior attorney requested a similar instruction in the first trial. According to Wilson, "[c]learly, there was no downside to such an instruction."

But the record here does not affirmatively rule out such a downside. By the time of the second trial, Wilson's defense team had an opportunity to review the entire police file, including any basis the police had for believing that Jacque B., Stephone B., or David H. were involved in the shooting, as well as any reasons for ultimately excluding them as suspects. For example, after reviewing the police record, the defense elected not to present any evidence concerning Jacque B. at the second trial, even though an informant claimed he was one of the shooters. Although we do not know what information the defense team gleaned about Jacque B. from reviewing the police file, we know that they ultimately determined that it was not helpful enough to the defense to outweigh any potential pitfalls. Yet a jury instruction that informed the jury that the withheld evidence "showed the possibility that the defendant was not involved in this homicide" could have invited the prosecution to introduce evidence concerning Jacque B. to show that even if he was one of the two shooters, it did not rule out Wilson's involvement as the second shooter. The prosecution could have potentially introduced evidence that the reason the police investigated Jacque B. as a potential suspect was that they received a tip that he was the other shooter with Wilson; and the prosecution could have introduced evidence explaining why the police decided they did not have sufficient evidence to conclude Jacque B. was involved.

---

showed the possibility that the defendant was not involved in this homicide, and 4) that the jury must consider this information in determining whether appellant is guilty of the charges in this case."

Unlike Wilson's trial counsel, we do not have the benefit of having reviewed the entire police file and the results from any follow-up investigation, so we cannot know the full scope of potential drawbacks that may have been raised by the instruction now advanced by Wilson.  Faced with a silent record, we will not assume that there was no satisfactory explanation for his trial counsel's actions.  (See *Mendoza Tello*, *supra*, 15 Cal.4th at p. 267.)

## B.

Wilson next contends that in his second trial, the trial court abused its discretion in allowing the prosecution's ballistics expert to offer her opinion that a bullet recovered from the crime scene was fired from the nine-millimeter pistol found in the Montoya Street apartment.  We disagree.

## 1.

At Wilson's second trial, Megan Pytlik, the People's ballistics expert, testified that firearms identification "is a discipline of forensic science that has as its primary purpose to determine whether a bullet or a cartridge case were fired from a particular firearm; or if there is no firearm, whether a group of bullets or a group of cartridge cases were fired from the same unknown firearm."  When asked how it was possible to determine whether a bullet or cartridge was fired from a specific gun, Pytlik explained that "[w]hen firearms are manufactured, there are microscopic imperfections that are left on the interior surfaces of the gun as a result of the manufacturing process."  According to Pytlik, the tools used to manufacture firearms undergo "microscopic" changes over time because "with each pass of a piece of tooling machinery[,] on a microscopic level the surface of that tool is changing."  Such changes in the tooling "result[] in microscopic imperfections on each firearm that are specific to that gun."  When ammunition is fired from a gun, the ammunition—which is made of softer metal than the gun—

16

"comes into contact with the[] machined portions of the gun," causing "microscopic imperfections from [the] manufacturing" of the gun to be "left on the fired ammunition components."

Pytlik testified that she examined nine 9-millimeter cartridge cases, observing them using a comparison microscope that allowed her to view "two items simultaneously in the same field of view." Examining two cartridge cases side by side under the microscope, she looked for "agreement" between the pattern of striations on each cartridge. Relying on close-up photographs of the cartridge cases that were entered into evidence and projected on a screen for the jury, Pytlik testified that for each of the nine cartridge cases, she observed "agreement of striations . . . between each of the" nine cases in an area called " 'the firing pin aperture shear mark.' " As a result of her observations, Pytlik testified that it was her "opinion" that the nine cases were fired from the same gun.

Pytlik further testified that she examined and tested a nine-millimeter semi-automatic pistol. She test-fired the gun into a water tank, which allowed her to recover the test-fired cartridge cases and bullets from the gun. When she compared the test-fired cartridge cases to one of the nine cartridge cases recovered from the crime scene, she observed "sufficient agreement" in the striations in the firing pin aperture shear mark area to allow her to form the "opinion that these cartridge cases were fired in the same firearm." The prosecution put into evidence the photographs that Pytlik took of the microscope comparison she performed between the test-fired cartridge case and the cartridge case recovered from the scene, and the photographs were displayed to the jury during her testimony.

Pytlik acknowledged that "ultimately my decision about whether I see enough agreement" to determine that a cartridge case was fired from a particular firearm "is a subjective decision" that is "based on my training, knowledge and experience." Pytlik

17

explained: "[A]s part of my training, I looked at hundreds of items that I knew were fired from the same gun, and I also looked at hundreds of items that I knew were fired from different guns; and in that way I learned what level of agreement can I expect to see between two items from the same source, what level of disagreement can I expect to see between items that have a different source; and then on top of that, as a worst-case scenario, I also look at items that were fired from consecutively manufactured firearms." According to Pytlik, "when I see sufficient agreement, it means that what I'm seeing is consistent with the agreement I've seen in the 10s of thousands of cartridge cases that I examined, that were fired from the same gun, that it exceeds the agreement that I have ever seen in two items produced by different tools, different firearms."

On cross-examination, Pytlik testified that her methodology does not result in a "statistical calculation concerning the likelihood of the [nine]-millimeter handgun having fired th[e] [nine]-millimeter casings." Further, there was no minimum number of duplicated marks between two items required for her to find "sufficient agreement" to reach an opinion that the items were fired from the same gun. She explained: "[u]ltimately my decision about whether I see enough agreement . . . is subjective."

Pytlik acknowledged that she was not able to say that the nine-millimeter gun she tested was "the only possible firearm" that could have fired the nine-millimeter cartridge cases recovered from the scene. She explained, "[t]heoretically I cannot exclude every firearm in the world" because it was not possible to test every firearm in the world, "but . . . based on the amount of agreement that I saw, in my opinion, I would not expect there to be another firearm that would leave that much agreement." Pytlik later added that "[t]he amount of agreement demonstrated in that comparison was textbook -- I would classify it as a large,

18

large amount of agreement, an easy conclusion to reach . . . . [T]here was a significant amount of agreement."

When asked if she could point to any studies supporting the theory that "every single firearm leaves a different marking on every bullet," Pytlik described two "objective," computer-aided, academic studies "show[ing] that known-matched scenarios, where items were fired from the same gun, demonstrate more similarity than items that were fired from different firearms." Pytlik also acknowledged that other studies from the National Research Council of the National Academy of Sciences and the President's Council of Advisors on Science and Technology (PCAST) had criticized the field of firearm toolmark identification for reasons including the subjectivity of the opinions of toolmark examiners and the lack of objective methodology.

Following Pytlik's testimony, Gerald Andrew Smith, a supervising criminalist at the same laboratory, testified that he verified her work in this case. Specifically, he looked at the same pieces of evidence that Pytlik examined, and, after examining them under his microscope, he reached "the same exact opinion" as Pytlik. Smith testified that he was aware of Pytlik's conclusion at the time he conducted his review, and he acknowledged that such a non-blind review process could have a "biasing effect" on the evaluation.

**2.**

Wilson does not argue on appeal that firearm toolmark analysis is subject to the test set forth in *Kelly*, *supra*, 17 Cal.3d 24, for the admissibility of expert evidence based on new scientific techniques, nor could he. (See *People v. Cowan* (2010) 50 Cal.4th 401, 470-471 (*Cowan*) [concluding that *Kelly* was inapplicable to firearm toolmark analysis because the method was neither a new scientific technique nor one that was " 'unusually difficult for laypersons to evaluate' "].) Instead, he

19

contends that the trial court erred under Evidence Code sections 801 and 802 in allowing Pytlik to offer testimony that was the "[f]unctional [e]quivalent of a [c]onclusion that the [c]rime [s]cene [c]asings [c]ould [o]nly [h]ave been [f]ired by the [g]un" recovered from the Montoya Street apartment. We will not overturn the trial court's decision to admit expert testimony unless it is " 'so irrational or arbitrary that no reasonable person could agree with it.' " (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)

In *Sargon*, our Supreme Court explained that trial courts perform an important "gatekeep[ing]" function. (*Sargon*, *supra*, 55 Cal.4th at p. 771.) Under Evidence Code section 801, subdivision (b), expert testimony must be "[b]ased on matter (including h[er] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to h[er] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion . . . , unless an expert is precluded by law from using such matter as a basis for h[er] opinion." Under Evidence Code section 802, the trial court may require that a witness who is offering an opinion be examined about the basis for the opinion, and the court may inquire into whether the basis supplied "actually supports the expert's reasoning." (*Sargon*, at p. 771.) The trial court must exclude expert evidence if it is based on material that cannot be reasonably relied upon, it is based on reasons unsupported by the material relied upon, or it is speculative. (*Id*. at pp. 771-772.) In performing this function, the trial court does not resolve scientific disputes or rule on the expert opinion's persuasiveness, but instead "must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Id*. at p. 772.)

20

Wilson relies on *People v. Azcona* (2020) 58 Cal.App.5th 504, 514 (*Azcona*), which held that a trial court erred in allowing a ballistics expert to testify that the projectiles in question "came from the same gun, 'to the practical exclusion of all other guns.' " The expert in *Azcona* testified that if he sees six matching marks in a row, the match is " 'much more than can ever happen by random chance,' " and that, with respect to the degree of scientific certainty, " '[i]t would be in the billions to be wrong on this.' " (*Id.* at pp. 510, 515; *id.* at p. 519 [conc. opn. of Greenwood, P.J.].) The only support for the expert's claim of scientific certainty was that he had " 'done numerous studies on the subject trying to see what can happen by random chance.' " (*Id.* at p. 514.) *Azcona* held that the trial court abused its discretion in allowing this testimony because "[s]uch a purportedly infallible conclusion is a leap too far from what the underlying method allowed." (*Ibid.*) Although the expert provided support for the conclusion that the projectiles probably came from the same firearm, he provided no basis for presenting his conclusion as a "scientific certainty." (*Ibid.*)

We disagree that Pytlik effectively testified "to a scientific certainty" that the casings recovered from the crime scene were fired from the gun found at the Montoya Street apartment. Unlike the expert in *Azcona*, Pytlik did not portray her opinion as objective truth or attempt to quantify her level of certainty. Pytlik was clear that her opinion was entirely subjective, there was no objective threshold for determining when there was "sufficient agreement," and there was no statistical calculation indicating the level of accuracy of her conclusion. She also admitted that she could not say that there was no other firearm that could have fired the casings in question, although she asserted that it would be impossible for her to rule out all other firearms because she could not test every other firearm in the world.

21

It is true that Pytlick also conveyed confidence in her opinion, classifying the level of agreement as "textbook" and stating that she would not expect to see the same level of agreement if the casings were fired with a different gun.  But her admittedly subjective opinion was logically supported by "matter (including [her] special knowledge, skill, experience, training, and education) perceived by or personally known to" Pytlik.  (Evid. Code, § 801, subd. (b); see *Azcona*, *supra*, 58 Cal.App.5th at p. 514 [concluding that although "there was no basis to present it as a scientific certainty," the ballistics expert's testimony provided "support for the opinion that the projectiles likely came from the same gun"].)  It was primarily based on Pytlik's experience examining tens of thousands of casings, including items for which there was known agreement and those for which there was known disagreement.  (See *People v. Valencia* (2021) 11 Cal.5th 818, 831, fn. 13 ["expert witnesses may acquire knowledge through their own experimentation, observations and personal experience"].)  Her opinion was also logically supported to some extent by her testimony about computer-aided academic studies.  (See *id.* at p. 831 [explaining that " 'experts may relate information acquired through . . . study of learned treatises, etc.' "].)  Further, Pytlik showed the jury photographs of the casings that she compared, indicating the areas of purported agreement that she relied upon in forming her opinion.  (Cf. *Cowan*, *supra*, 50 Cal.4th at p. 471 [explaining that the toolmark expert showed photographs including "the test-fired bullets and the recovered bullets to the jury and identified the points of similarity he found"].)[5]  The trial court's conclusion that Pytlik's

---

[5] Because Wilson did not put the exhibits relied upon by Pytlik into the appellate record, we are unable to review them. Where the appellate record is inadequate for review, " ' "[i]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented." ' " (*Jameson v.*

22

opinion had a sufficient basis to be presented to the jury was neither arbitrary or irrational.  (See *Sargon*, *supra*, 55 Cal.4th at pp. 772-773.)

Ultimately, the jury was presented with the parties' competing views about the validity of firearm toolmark evidence, and it was the jury's task to evaluate that evidence, taking into account the subjective nature of Pytlik's assessment of the casings she examined.[6]  (See *Cowan*, *supra*, 50 Cal.4th at p. 471.)

## DISPOSITION

The judgment is affirmed.

BURNS, J.

WE CONCUR:


JACKSON, P. J.
CHOU, J.

*People v. Wilson* (A170683)

---

*Desta* (2018) 5 Cal.5th 594, 609 (*Jameson*); see also *People v. Hooper* (2019) 40 Cal.App.5th 685, 696 [explaining that in a challenge to the trial court's admission of evidence, "[t]he burden is on the appellant to demonstrate error," citing *Jameson*, at pp. 608-609].)

[6] The trial court also allowed the defense to put on its own experts on the validity of firearm toolmark analysis, denying the prosecution's motion to exclude defense experts.  However, the defense ultimately did not present those witnesses at trial.